Rodolfo "Corky" GONZALEZ, Crusade for Justice, and the National American Indian Movement, Inc.

v.

Edward P. LEONARD, Individually and as Commissioner of the Connecticut State Police, Leonard F. Chapman, Jr., Individually and as Commissioner of the U. S. Immigration and Naturalization Service, and Robert Money, Individually and as Assistant District Director for Investigations, Hartford, Connecticut, Office of the U. S. Immigration and Naturalization Service.

Civil Action No. H76–350.

United States District Court,
D. Connecticut.

Aug. 28, 1980.

01:02**1060**

William M. Kunstler, New York, N.Y., Victor M. Ferrante, Bridgeport, Conn., for plaintiffs.

Paul V. McNamara, McNamara, Clancy, Kenney & Sullivan, P. C., Bridgeport, Conn., Frank Rogers, Asst. Atty. Gen., Meriden, Conn., Carl R. Ajello, Atty. Gen. of the State of Connecticut, Hartford, Conn., for defendant Edward P. Leonard.

Frank H. Santoro, Asst. U. S. Atty., Richard Blumenthal, U. S. Atty. for the District of Connecticut, New Haven, Conn., for defendants Robert D. Money and Leonard F. Chapman, Jr.

## MEMORANDUM AND ORDER

JOSÉ A. CABRANES, District Judge:

### Introduction

On June 18, 1976, the Connecticut State Police sent a telex message to other law enforcement agencies around the country, erroneously stating that Rodolfo "Corky" Gonzalez of Denver, Colorado, the National American Indian Movement, Inc. ("AIM"), and two other organizations had devised a plan to "kill a cop a day in each state" by luring police officers into ambushes. This case was brought on August 31, 1976 by Gonzalez, AIM and the Crusade for Justice, a Colorado corporation founded and chaired by Gonzalez,[1] against the federal and state

---

1. Deposition of Rodolfo "Corky" Gonzalez ("Gonzalez Dep."), p. 6. The deposition transcripts referred to herein are part of the file in the case, and have been submitted by counsel

officials who, the plaintiffs allege, were responsible for the dissemination of the telex.

Plaintiff Gonzalez describes himself as a lecturer, poet, playright, community organizer and leader of the Mexican–American movement in Denver and elsewhere in the United States.[2] The Crusade for Justice, which is based in Denver, is described in the plaintiffs' complaint as "an independent civil rights, social action and community services organization, dedicated to the betterment of the Chicano people."[3] Plaintiff AIM, a Minnesota corporation based in St. Paul, Minnesota, describes itself as "an organization dedicated to the attainment of treaty and other rights for Native Americans throughout the Americas."[4]

The defendants are Robert D. Money, who in 1976 was Assistant Director for Investigations of the Hartford office of the Immigration and Naturalization Service (the "INS") of the United States Department of Justice (and disclosed the "kill a cop a day" story to the Connecticut State Police); Leonard F. Chapman, Jr., who was Commissioner of the INS at the time the telex was sent; and Edward P. Leonard, who was Commissioner of the Connecticut State Police in 1976.[5]

Before the court for adjudication are several motions: the motions for summary judgment filed by Money and Chapman (the "federal defendants"), Leonard's motion for summary judgment, and the plaintiffs' motion to join as defendants the INS, Attorney General Benjamin Civiletti, and the State of Connecticut. In order to determine the merits of the summary judgment motions, the court construes the plaintiffs' vague complaint as generously as it can, and discerns three claims or categories of claims upon which the plaintiffs seek, or may seek, relief: (1) a claim that the defendants defamed the plaintiffs by causing the publication of false and derogatory information about them; (2) claims that the defendants violated the plaintiffs' constitutional rights; and (3) a claim that the defendants violated the provisions of the Privacy Act, 5 U.S.C. § 552a.

On the basis of the undisputed facts, the court concludes, for the reasons stated at greater length below, that the federal defendants have an absolute immunity from liability for the tort of defamation; that neither Chapman nor Leonard may be deemed responsible for any defamation of the plaintiffs; that the plaintiffs' claims under the United States Constitution are without foundation (and that even if those claims were not otherwise legally deficient, neither the federal defendants nor Leonard would be proper defendants on them); and that neither the federal defendants nor Leonard may be sued for alleged violations of the Privacy Act. Accordingly, the court grants the defendants' summary judgment motions.

The court's conclusions on the legal issues raised by the summary judgment motions lead it to deny the plaintiffs' motion to add defendants.

## I. THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A. The Facts

#### (1) The INS Intelligence Report

On Tuesday, June 15, 1976, defendant Money received from the INS Eastern Regional Office a report (the "Intelligence Report") prepared by INS Eastern Regional Intelligence and Security Officer Thomas J. Cronin. That document, dated June 7, 1976, stated that certain individuals and organizations were involved in a plot to kill police officers by trapping and ambushing

and considered by the court on the summary judgment motions, as provided by Rule 56(c), Fed.R.Civ.P.

2. Complaint, ' II.A.1..

3. Complaint, ' II.A.2.

4. Complaint, ' II.A.3.

5. Money, Chapman and Leonard are all now retired. Transcript of Oral Argument, June 30, 1980 ("Tr."), p. 19; Pre-Trial Summary submitted by defendant Leonard, filed on May 14, 1980, ' I.D.

them.[6] The Intelligence Report, which identified the Bureau of Indian Affairs as the original source of this information,[7] also stated that the plaintiffs possessed a rocket launcher, rockets, explosives and M–16 military rifles with "banana clips."[8] According to Money, such intelligence reports were prepared either on a weekly or biweekly basis by regional intelligence officers of the INS, and were regularly distributed to the various INS regional and local offices and to the central INS office in Washington.[9]

At his deposition, Money testified that he became "quite upset" upon reading about the plot to kill police officers.[10] He recalled that "it seemed to me there was an immediate danger and a need to find out if the [State] Police had been advised of this."[11] "[A]s [would] any citizen, I felt I had an obligation to inform the State Police, to protect themselves, if they didn't know. I really thought they already knew."[12] Money discussed the Intelligence Report with his superior, Edwin J. Maloney, Deputy District Director of the INS Hartford office. They decided to ask Cronin, the author of the report, whether it would be appropriate to release the information in the Intelligence Report to the Connecticut State Police.[13]

Cronin—who is not a defendant in this case—told Money that he should "go ahead and release" the information because of the "obvious seriousness" of the reported threat to the lives of police officers.[14] Accordingly, Money called the Connecticut State Police. He informed Sergeant William F. Taylor of the Criminal Intelligence Division of that agency of the reported plot to kill police officers[15] and asked Taylor whether he had already received such information.[16] Taylor replied that he had not heard of such a plot, and Money told him:[17]

> Well, for whatever it is worth, this is the information that came in our intelligence report. And I am pretty disturbed about it, because it makes a violent threat against the lives of police officers.

Money made no recommendations or suggestions concerning the dissemination of this information by the State Police.[18]

The next day, Wednesday, June 16, 1976, Sergeant Taylor called Money and asked him whether he could obtain more information about the INS Intelligence Report.[19] Money told Taylor that he would try to get additional data[20] and again called Cronin,

---

6. Deposition of Robert D. Money ("Money Dep."), pp. 8–10, 18. *See* undated INS document referred to in note 14, *infra*. Although Money recalled at his deposition on July 5, 1977 that he received the Intelligence Report on June 1 or June 6, 1976, Money Dep., pp. 12, 18, in fact he could not have received the report, which was dated June 7, 1976, until later in the month. An affidavit sworn to by Money on October 1, 1976, and filed with the Clerk of the Court on July 24, 1980, indicates that Money first saw the Intelligence Report on June 15, 1976. *See also* Tr. 49. This is consistent with the other facts developed in this case. The Intelligence Report itself—first requested by the plaintiffs' counsel in a document production requested filed on May 27, 1980—was produced by Money's counsel pursuant to Rule 34(b), Fed.R.Civ.P., and filed with the Clerk of the Court on June 23, 1980.

7. Money Dep., p. 33.

8. Money Dep., pp. 8–9.

9. Money Dep., p. 9.

10. Money Dep., p. 12.

11. *Id.*

12. Money Dep., p. 36.

13. Money Dep., pp. 12 · 13.

14. Money Dep., p. 13. An undated internal INS memorandum signed by Cronin confirms that after some discussion, Cronin gave Money clearance to release the information to the Connecticut State Police. This document, produced in response to the plaintiffs' request for the production of documents on June 23, 1980, is on file with the Clerk of the Court.

15. Money Dep., p. 14. Sergeant Taylor was the intelligence officer to whom Money's call to the State Police was referred.

16. Money Dep., p. 36.

17. *Id.*

18. Money Dep., pp. 36–37.

19. Money Dep., p. 16.

20. *Id.*

seeking verification of the Intelligence Report and further information relating to it.[21] In an effort to confirm the "kill a cop a day" story, Money asked Cronin whether there was any way to verify the Intelligence Report by contacting the Bureau of Indian Affairs, which had been described in that report as the source of the information.[22] According to Money's later account, Cronin replied that he was "doing the best he could to try to go back to the original source of [the] information."[23] Cronin called Money back later that day and informed him that all the information he had was in the Intelligence Report.[24] Money communicated this fact to Sergeant Taylor.[25]

On Thursday, June 17, 1976, Sergeant Taylor called Money to ask him, once more, to search out additional information about the story in the Intelligence Report.[26] Money agreed to do so and made several further calls to Cronin.[27] On each occasion, Cronin explained to Money that his office had no more information about the "kill a cop a day" story.[28] On Friday evening, June 18, 1976, Money called Commissioner Leonard, whom he knew personally,[29] to assure the commissioner that Money had done everything he could think of "to get more information to clarify it one way or another," and to tell Leonard that he had been unable to uncover additional facts relating to the story in the Intelligence Report.[30]

### (2) The June 18, 1976 Telex

On Friday, June 18, 1976, Sergeant Taylor sent the following telex message to various federal, state and local law enforcement agencies around the United States: [31]

Ref: American Indian Movement/Brown Beret/Students for Democratic Society

A spokesman for the Bureau of Indian Affairs stated that they had received information that the American Indian Movement (AIM) had made contact with the Brown Beret, a militant Chicano group in the Denver area with the idea of joining forces at least in instances benefiting both groups. The S.D.S. (Students for a Democratic Society), is also reemerging as a militant force and has been in contact with AIM and the Brown Beret. Rudolfo [sic] (Corky) Gonzalez, a leader of the Brown Beret, reportedly has a rocket launcher and rockets either in his possession [or] available to him along with explosives, hand grenades, and ten to fifteen M–16 rifles with banana clips. The objectives of the group are disturbance and terrorism. They are reported to have plans to kill a cop a day in each state. Two vehicles have been identified as being set up to accomplish this killing and various ruses will be used to lure law enforcement officers into an ambush. False reports of family disturbances, drunken drivers, and other traffic violation[s] are to be used. When an officer arrives on the scene of a family disturbance or stops a reported vehicle, armed members will cut down the officer when he approaches. The vehicles are described as gray van with Colorado license plates AC–2086 and a 1973 Ford Econoline van with Wyoming plates 2915A. Any department having information please contact the Criminal Intelligence Division at telephone area code 203–566–2610 or Executive Officer, Communications Division at telephone 203–566–4240 —Toll Free 1–800–842–0200, after normal business hours.

21. *Id.*

22. Money Dep., p. 34.

23. *Id.*

24. Money Dep., p. 17.

25. *Id.*

26. *Id.*

27. *Id.*

28. Money Dep., pp. 17–18.

29. Money Dep., p. 19.

30. *Id.*

31. Deposition of William F. Taylor ("Taylor Dep."), p. 6; Complaint, Exhibit A.

The information in the telex was essentially that which Money had furnished to Sergeant Taylor.[32]

Taylor transmitted the telex message, apparently on the advice of his superior, Sergeant Robert Root, who was commanding officer of the Criminal Intelligence Division.[33] Leonard did not authorize the drafting or transmission of this message, and did not even see it until after it had been sent out by Taylor.[34]

The substance of the June 18 telex turned out to be false.[35] However, nothing in the record even suggests that the defendants knew, or had reason to know, that the "kill a cop a day" story was untrue at or before the time the telex was sent. In any event, as a result of the dissemination of the telex, the misinformation about the plaintiffs was apparently publicized by newspapers in Detroit and Denver, and a television station in Lubbock, Texas; it may also have been given currency by other news media elsewhere in the country.[36]

In his deposition, Money recalled that approximately two and a half weeks after the telex was sent, he received a Department of Justice teletype message stating that, after evaluation of the sources of the information in the INS Intelligence Report, the contents of that report had been downgraded to the level of a "street rumor."[37] That teletype stated that Gonzalez was not connected with the Brown Berets and that, in any case, the Brown Berets were no longer active as an organization.[38] It is not clear whether the distribution of reports publicizing this downgrading of the "kill a cop a day" story was as widespread as that of the original June 18 telex.[39]

### (3) The Injury Claimed by the Plaintiffs

The nature of the injury which the plaintiffs allegedly suffered as a result of the circulation of the "kill a cop a day" story is summarized by Gonzalez' testimony that[40]

[t]he privacy and lives of people are endangered by [law enforcement intelligence] groups. . . . Also, when a bulletin comes out saying that we're prepared to kill a cop a day, I feel that this is a murder warrant, a death warrant, signed by proxy. Anything I do out of hand, how I speak, what I say to certain individuals may constitute belligerence and also constitute my death warrant. Again, I'm saying that also coming out in the press, in the media, places us in the light of very dangerous individuals. Therefore, our credibility is demean[ed] and lessened, and our existence is one of being credible to the community because

---

**32.** Money Dep., p. 32; Taylor Dep., pp. 5-6.

**33.** Taylor Dep., pp. 5-6, 9-10; Deposition of Robert Root ("Root Dep."), p. 7.

**34.** Deposition of Edward P. Leonard, pp. 6-8; Affidavit of Edward P. Leonard, sworn to May 27, 1980. See Taylor Dep., pp. 5-6; Root Dep., p. 7. Neither Taylor nor Root is a defendant in this action.

**35.** See Money Dep., p. 23. There is even an indication in the record that the license plates mentioned in the telex were registered not to the plaintiffs but to a 50-year-old Denver man and a minister in Cheyenne, Wyoming, both of whom apparently had no connection with the plaintiffs. See Complaint, Exhibit B-1.

**36.** Complaint, Exhibits B-1—B-3; Gonzalez Dep., p. 69.

**37.** Money Dep., pp. 21-22.

**38.** Money Dep., p. 23.

**39.** The plaintiffs' complaint alleges, on information and belief, that the communication downgrading the report about the supposed "kill a cop a day" plot was distributed only to law enforcement agencies within the state of Connecticut. Complaint, ' 15. The defendants denied this allegation. Answer of Defendants Money and Chapman, ' 11; Answer of Defendant Leonard, ' 5. The testimony of Sergeant Taylor as to the transmission of such a report by the Connecticut State Police supports the plaintiffs' contention. Taylor Dep., p. 12. On the other hand, Money's testimony raises the possibility that the United States Department of Justice sent a message downgrading the original report to federal and state law enforcement authorities around the nation. See Money Dep., pp. 22-23.

**40.** Gonzalez Dep., p. 31; see also id. at 43-44, 74 ("I think it was used to have me assassinated, in a sense, murdered by proxy. . . . "), 78; Tr. 46-48. But see Gonzalez Dep., pp. 61-63 and note 52, infra, and accompanying text.

we have given our lives to support that community. We try to give them inspiration to stand up and do more for themselves, and be articulate, and organize themselves, and stand up and demand their rights. So, I think that if this type of thing comes out what it does is cut our credibility down and places us in a very tenuous position and a very dangerous position.

As a consequence of the damage to its credibility and reputation, Gonzalez testified, the Crusade for Justice[41] suffered a decline in membership and influence.[42] Moreover, in Gonzalez' view, the enrollment at a school run by that organization declined,[43] and the group's financial condition became weaker.[44] Gonzalez also claims that he personally lost an unspecified amount of income because he received fewer invitations to give public lectures after the transmission of the June 18 telex than before the event.[45] Although the complaint seeks compensatory damages of $500,000 for each of the organizations and $350,000 for Gonzalez,[46] the plaintiffs have not documented or presented specific evidence of any financial losses and Gonzalez testified that "I don't think you can put a monetary figure" on the losses sustained by the Crusade for Justice.[47]

Gonzalez also testified that, after the "kill a cop a day" story was publicized, intelligence agents affiliated with various law enforcement organizations followed and harassed him and other members of the Crusade for Justice.[48] However, according to Gonzalez, the police had created an image of the Crusade as an organization with violent tendencies long before the circulation of the telex[49] and had surveilled and otherwise harassed the plaintiffs at least since the days of the Nixon administration, and even as long ago as 1964.[50] In spite of the allegations in the complaint that the publication of the June 18 telex was the cause of police harassment, the materials submitted in connection with the pending summary judgment motions contain nothing linking the claimed harassment of the plaintiffs to the dissemination of that message.

41. The Crusade for Justice was not named in the June 18 telex. However, Gonzalez claims that its reputation was injured along with his, since "my name is synonymous with the Crusade for Justice." Gonzalez Dep., p. 50. The other groups mentioned in the telex—the Students for a Democratic Society and the Brown Berets—were separate from the Crusade for Justice, and neither Gonzalez nor the Crusade for Justice was affiliated with them. *See* Gonzalez Dep., pp. 51–52.

42. Gonzalez Dep., pp. 15, 79.

43. Gonzalez Dep., p. 44.

44. Gonzalez Dep., pp. 43–45.

45. Gonzalez Dep., pp. 74–75, 79.

46. Complaint, ' V.E.

47. Gonzalez Dep., p. 43. The court raises the question of pecuniary harm only insofar as it is relevant to the question whether the plaintiffs have demonstrated the existence of any genuine issue as to their claims that the defendants' conduct in fact caused them some injury. The issue of the amount of any compensatory or other damages is, of course, not before the court on these motions for summary judgment.

48. Gonzalez Dep., pp. 46–47. Gonzalez also testified that, as a result of the publicity given the "kill a cop a day" story, he received at least one "hate letter" and many threatening telephone calls. Gonzalez Dep., p. 77.

49. Gonzalez Dep., p. 59. At his deposition, Gonzalez testified that the allegations of violent behavior contained in the June 18 telex "couldn't have been any worse than the allegations of police station bombings which was . . . a proven conspiracy by the District Attorney, the [Bureau of Alcohol, Tobacco and Firearms] and by the Denver Police Department. . . ." Gonzalez Dep., p. 67. The incident to which Gonzalez referred concerned allegations by Colorado law enforcement authorities that he and the Crusade for Justice were responsible for plans to bomb police stations in Denver; those allegations preceded the dissemination of the "kill a cop a day" story. *See generally* Gonzalez Dep., pp. 55–56, 67.

50. Gonzalez Dep., pp. 28–30, 60–61, 67. At his deposition in 1979, Gonzalez referred to "[t]he threats and harassment that my children have learned how to deal with over the last 15 years." *Id.* at 28.

### (4) Money's State of Mind

For reasons discussed later in this Memorandum and Order, the state of mind of defendant Money is relevant to the qualified immunity defense which he has raised as a bar to the plaintiffs' constitutional claims. The deposition of Money sheds light on his motivation in acting as he did with respect to the "kill a cop a day" story. Money testified that he communicated the substance of the INS Intelligence Report to the Connecticut State Police "out of fear for the lives of unsuspecting police officers" and that he believed that he was acting within the bounds of the law when he called the report to the attention of Sergeant Taylor.[51]

The plaintiffs have not provided the court with any evidence contradicting Money's testimony on his purpose in acting as he did or his knowledge of the legality of his actions. Although Gonzalez testified that he believed that a wide-ranging conspiracy of law enforcement officials was trying to discredit the plaintiffs, he conceded that he did not know whether Money passed false information to the Connecticut State Police with knowledge that it was false or with the intent to harm the plaintiffs.[52] Indeed, while the plaintiffs have, on the motions for summary judgment, challenged the objective reasonableness of Money's beliefs, they have not cast doubt on Money's testimony as to either his subjective state of mind—i.e., what he believed—with regard to the June 18 telex and the "kill a cop a day" story, or the sincerity of those beliefs.

### B. The Plaintiffs' Claims

Under the heading "Cause of Action" in the complaint, the plaintiffs allege that the Connecticut State Police transmitted the June 18 telex to law enforcement agencies around the country; that the substance of the telex was given widespread publicity by the news media; that "many, if not all, of the recipients of the said telex message took its contents extremely seriously and instituted immediate plans and procedures to prevent the implementation of the alleged plan or conspiracy on the part of the plaintiffs 'to kill a cop a day in each state'"; that Money was the source of the information in the telex, which came from "somewhat raw" and "unevaluated" stories; and that a subsequent message downgrading the contents of the June 18 telex to a "street–level rumor" was distributed, but only to law enforcement agencies within Connecticut.[53]

The precise nature of the plaintiffs' claims is not self–evident, either from the description of the "Cause of Action" in the complaint or the citations therein to various statutory and constitutional provisions. However, construing the plaintiffs' allegations as broadly and favorably as possible, the court discerns three types of claims which the plaintiffs may have against the defendants.

First, the gravamen of the complaint apparently is that the defendants defamed them—i. e., invaded their "interest in reputation and good name." W. Prosser, Law of Torts 737 (4th ed. 1971). See also Restatement (Second) of Torts §§ 558–59 (1977) (defamation is "an unprivileged publication" of "false and defamatory" matter "concerning another" under certain circumstances; a defamatory communication is one which "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him").

A second set of claims asserted by the plaintiffs purport to arise under the Constitution of the United States. The complaint invokes the "First, Fifth and Fourteenth Amendments."[54] In broad terms, the plaintiffs allege that the defendants "disrupted the organizational plaintiffs, interferred [sic] with their political activities and prevented their growth," thereby causing the "suppression of rights of free speech

**51.** Money Dep., p. 41.

**52.** Gonzalez Dep., pp. 60–63.

**53.** Complaint, ¶¶ 7–15 and Exhibit C.

**54.** Complaint, ¶ I.1.

and association" and reducing support for the organizations.[55] As a result of these acts of the defendants, the plaintiffs charge, the "plaintiffs sustained damage to their privacy, their reputations, and political freedoms of expression and association, and freedom to travel, as well as danger to life and property." [56]

Finally, as a third type of claim, the plaintiffs allege, without stating any particulars, that the defendants violated provisions of the Privacy Act [57] which impose upon federal agencies certain obligations concerning the maintenance and dissemination of official records. The plaintiffs allege that the defendants are therefore subject to civil liability under 5 U.S.C. § 552a(g)(1).

On the pending motions for summary judgment, the court proceeds to consider the plaintiffs' claims, or putative claims, for defamation, for violations of constitutional rights and for violations of the Privacy Act, in light of the undisputed material facts and applicable principles of law.

### (1) Defamation

Of the claims which the complaint appears to state, none seems more logically connected with the facts pleaded than a common law claim for defamation. The plaintiffs have not expressly cast their grievance in terms of such a claim, and in fact have expressly renounced any common law theory of liability.[58] Nonetheless, because the gravamen of the plaintiff's complaint closely resembles a state law defamation claim, the court is compelled to consider at least certain threshold questions relevant to such a claim. On those preliminary issues, and without considering the substance of this or any other common law cause of action which the plaintiffs might have, the court determines for the reasons set forth below that none of the defendants may properly be sued on a claim for defamation.

### (a) Money

Assuming *arguendo* that the plaintiffs would otherwise be entitled to judgment against Money on a defamation claim, his status as a federal officer acting within the scope of his duty bars recovery here. As a matter of federal law, an official of the executive branch of the federal government, such as Money, has an absolute immunity from tort liability so long as he is acting "within the outer perimeter of [his] line of duty." *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959).[59]

---

**55.** Complaint, ' 16; *see also id.* ' 17 (similar allegations as to Gonzalez).

**56.** Complaint, ' 18.

**57.** The sections invoked are 5 U.S.C. §§ 552a(e)(5), (6), (7), (9) and (10). Complaint, ' I.1.

**58.** Tr. 40· 41.

**59.** The absolute privilege against tort claims, established in *Barr*, is in no way affected by the Supreme Court's holding in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), that federal officials are entitled only to a qualified privilege against claims arising under the United States Constitution. The Court in *Butz* distinguished *Barr* on the basis of the source of the legal right giving rise to the plaintiff's claim:

Accepting this extension of [absolute] immunity with respect to state tort claims, however, we are confident that *Barr* did not purport to protect an official who has not only committed a wrong under local law, but has also violated those fundamental principles of fairness embodied in the Constitution.

*Butz v. Economou, supra*, 438 U.S. at 495, 98 S.Ct. at 2905. (footnote omitted). In *Butz*, the plaintiffs asserted claims arising under both the Constitution and New York tort law. The Supreme Court's holding was expressly limited to the constitutional claims. *Id.* at 495 n.22, 98 S.Ct. at 2905 n.22. On remand, Judge Mac-Mahon considered the plaintiffs' state law tort claims and held that on those claims the defendant federal officials, acting within "the outer perimeter of [their line] of duty," were entitled to absolute immunity, since the Supreme Court's holding in *Butz* had not diminished the authority of *Barr*. *Economou v. Butz*, 466 F.Supp. 1351, 1355 & nn. 6–7 (S.D.N.Y.1979). Other decisions similarly make it clear that *Barr* is still good authority after *Butz*. *See Miller v. DeLaune*, 602 F.2d 198, 199–200 (9th Cir. 1979) (per curiam); *Bush v. Lucas*, 598 F.2d 958, 960 (5th Cir. 1979), *judgment vacated on other grounds*, 446 U.S. 914, 100 S.Ct. 1846, 64 L.Ed.2d 268 (1980); *Birnbaum v. United States*, 588 F.2d 319, 332 (2d Cir. 1978);

In *Barr*, former employees of the federal Office of Rent Stabilization sued the acting director of that office for libel. The alleged defamation in that case was contained in a press release issued by the office at the defendant's direction, and was widely disseminated in reports in the news media. In a plurality opinion, Justice Harlan observed that it is essential that

> officials of the government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties— suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of the policies of government.

*Barr v. Matteo, supra,* 360 U.S. at 571, 79 S.Ct. at 1339. The plurality therefore held that the acting director's "plea of absolute privilege in defense of the alleged libel published at his direction must be sustained," for it was within the broad discretion entrusted to him to issue a press release on a matter of public concern relating to his agency. *Id.* at 574, 79 S.Ct. at 1341. Justice Harlan conceded that, as a result of this absolute immunity doctrine, "there may be occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good." *Id.* at 576, 79 S.Ct. at 1342. *See also Howard v. Lyons,* 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959) (under *Barr,* the commanding officer of the Boston Naval Shipyard had an absolute privilege, against a defamation claim, to distribute a report criticizing a labor organization representing workers at the shipyard).

From the facts established by the deposition testimony submitted to the court, it is evident that Money was acting within the scope of his discretionary duties in making information about the alleged "kill a cop a day" plot available to state police authorities. In his capacity as Assistant Director for Investigations in the INS office in Hartford, he routinely received the reports which were regularly published by his agency's regional intelligence office. It also appears to have been within the ambit of his responsibilities to review the Intelligence Report and discuss its contents with his superior (Deputy District Director Maloney). Similarly, Money did not exceed the scope of his duties by communicating information in the report (which was of obvious interest to the Connecticut State Police) to Sergeant Taylor, after obtaining authority from the regional INS officer responsible for the Intelligence Report.[60] Money therefore did not go beyond the proper bounds of his discretion or the limits of his duties by alerting state law enforcement authorities to the "kill a cop a day" story, which came to his attention through regular INS channels. Nor were Money's subsequent actions with respect to the Intelligence Report— checking, on several occasions, the veracity of the story and seeking, at the request of the state police, additional information about it from INS sources—outside the "outer perimeter of [his] line of duty," *Barr v. Matteo, supra,* 360 U.S. at 575, 79 S.Ct. at 1341. Money is entitled to the protection of the doctrine of absolute immunity established in *Barr,* and to summary judgment on any defamation claim which may be implicit in the complaint.[61]

*(b) Chapman*

■ There is no basis in the complaint for any defamation claim against Chapman, who is not even alleged to have been re-

---

*Harper v. Blumenthal,* 478 F.Supp. 176, 183 (D.D.C.1979).

**60.** *See* note 15, *supra.*

**61.** This conclusion applies with equal force to any other tort claims which might be asserted on the set of facts presented here. It is unclear whether the law of Colorado (or any other state whose law might properly be invoked by one or more of the plaintiffs) recognizes a cause of action for the tort of invasion of privacy in cases such as this. *See Restatement (Second) of Torts* §§ 652A(2)(d), 652E (1977) ("privacy" cause of action for publicity which places person in false light). However, even if such a claim were otherwise legally cognizable, it could not, under *Barr,* be maintained against Money.

sponsible for the publication of the June 18 telex. Had the plaintiffs alleged any culpable conduct on his part, Chapman would, of course, be entitled to the immunity of *Barr v. Matteo, supra,* to the extent that any relevant conduct was within the scope of his discretionary duties. Since there are no allegations of acts which might conceivably be the basis for imposing tort liability on Chapman, the court has no occasion to apply *Barr* to this defendant.

### (c) Leonard

█ Leonard is also an improper defendant on a defamation claim arising from the transmission of the June 18 telex, for the facts before the court demonstrate that he was in no way responsible for the contents of the telex or its dissemination to persons outside the Connecticut State Police. He was not responsible for the gathering of the information contained in the telex, he did not authorize it to be drafted or transmitted, and he did not even see the telex message until after it had been sent out by Sergeant Taylor. Because no act of Leonard's constitutes "publication" of the June 18 telex, *see generally* W. Prosser, Law of Torts 766–71 (4th ed. 1971); *Restatement (Second) of Torts* §§ 558, 577 (1977),[62] he cannot be held liable even if the transmission of the telex constituted an unprivileged publication of defamatory material.

### (2) Alleged Violations of the Plaintiffs' Constitutional Rights

### (a) The Insufficiency of the Claims

As noted previously, the complaint is generally vague as to the nature of the claims asserted by the plaintiffs. Nowhere is it less precise than in the plaintiffs' allegations that the defendants infringed their rights under the United States Constitution. While a number of constitutional provisions and rights are mentioned in the complaint, the plaintiffs' purported constitutional claims all have their origin in the transmission of the allegedly defamatory telex. From the complaint and the deposition testimony of plaintiff Gonzalez, it appears to be the plaintiffs' theory that the publicity given the telex adversely affected their good names and reputations and that this in turn led to: (a) a decline in the membership of the plaintiff organizations (and in participation in certain of their activities); (b) a decrease in the number of Gonzalez' speaking engagements (with a concomitant decline in his income from lecturing); and (c) harassment of the plaintiffs by law enforcement authorities.

In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court squarely held that neither the right to due process of law nor the right of privacy under the United States Constitution protect the interest of a person in his good name and reputation from the results of adverse publicity generated by law enforcement agents.[63] In *Paul,* plaintiff Davis, a newspaper photographer in Louisville, Kentucky, had been arrested (but not convicted) for shoplifting in that city. On the basis of that arrest, the police chiefs of Louisville and Jefferson County, Kentucky included the plaintiff's name and a "mug shot" photograph of him in a flyer, distributed to approximately 800 local merchants, which purportedly identified "active shoplifters." The flyer branded Davis as "active in this criminal field." Shortly after the flyer was circulated, the shoplifting charge against Davis was dismissed.

---

62. The result might be different if the plaintiff had alleged that the telex was published by agents of Leonard acting within the scope of authority delegated to them by him. *See* W. Prosser, Law of Torts 770 (4th ed. 1971).

63. Even before *Paul v. Davis* was decided, the Court of Appeals for the Second Circuit had held that a complaint alleging that a law enforcement agency provided defamatory information about the plaintiff to the news media stated no cause of action for violation of the constitutional right of privacy or any other federally protected right. *Rosenberg v. Martin,* 478 F.2d 520, 524 & n. 4 (2d Cir.) (Friendly, C. J.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973). *Cf. Heller v. Roberts,* 386 F.2d 832 (2d Cir. 1967) (per curiam); *Association for the Preservation of Freedom of Choice v. Simon,* 299 F.2d 212, 214 (2d Cir. 1962).

Davis brought an action against the local police chiefs in federal court under 42 U.S.C. § 1983. He claimed that the distribution of the flyer violated his constitutional rights and that his future employment opportunities would be seriously impaired by the publicity which falsely identified him as a criminal. The district court dismissed Davis' claim, and the Court of Appeals for the Sixth Circuit reversed. The Supreme Court reversed the latter decision and held that the defendants were not liable for violating the plaintiff's constitutional rights.

The Court in *Paul* disposed of the plaintiff's contention that the due process clause of the Fourteenth Amendment protected him from the harmful effects of defamation by state law enforcement officers:

> The words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause. . . . [T]he weight of our decisions establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.

*Paul v. Davis, supra*, 424 U.S. at 701–02, 96 S.Ct. at 1160–1161 (footnote omitted). The Court noted that state action which "distinctly alter[s] or extinguishe[s]" a "right or status previously recognized by state law" calls the due process clause into play. *Id.* at 711, 96 S.Ct. at 1165. However, it found that "Kentucky law does not extend to [Davis] any legal guarantee of present enjoyment of reputation which has been altered as a result of [the police chiefs'] actions."

*Id.* at 711–12, 96 S.Ct. at 1165. Therefore, the Court held, "any harm or injury to" the plaintiff's interest in his reputation "does not result in a deprivation of any 'liberty' or 'property' recognized by any state or federal law, nor has it worked any change of [his] status as theretofore recognized under the State's laws." *Id.* at 712, 96 S.Ct. at 1166. Accordingly, the Court concluded that Paul asserted no right protected by the due process clause, "however seriously [the police chiefs] may have harmed respondent's reputation . . . ." *Id.*

The Court in *Paul* also rejected Davis' claim that his "right to privacy guaranteed by the First, Fourth, Fifth, Ninth and Fourteenth Amendments," 424 U.S. at 712, 96 S.Ct. at 1166, had been violated. The Court held that the right of privacy recognized by the Supreme Court in cases such as *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), does not extend to the protection of an individual's reputation from unfavorable publicity, prompted by the actions of law enforcement officials, which falsely places him in a bad light:

> In *Roe* the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are "fundamental" or "implicit in the concept of ordered liberty," as described in *Palko v. Connecticut*, 302 U.S. 319, 325 [58 S.Ct. 149, 152, 82 L.Ed. 288, 292] (1937). The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

> Respondent's claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere intended to be "private," but instead on a claim

that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner."

*Paul v. Davis, supra,* 424 U.S. at 713, 96 S.Ct. at 1166.

While *Paul* concerned defamation by a state law enforcement agent, the rationales of the decision apply equally to cases in which plaintiffs cloak their defamation claims against federal officials, such as defendants Money and Chapman, in constitutional terms. *See Paul v. Davis, supra,* 424

U.S. at 702 n. 3, 96 S.Ct. at 1161 n. 3. Subsequent decisions have applied the doctrine of *Paul* to such cases. *See, e. g., Jones v. Palmer Media, Inc.,* 478 F.Supp. 1124, 1129 (E.D.Tex.1979) (action against administrative assistant to Congressman for permitting a newspaper publisher to see a file pertaining to the plaintiff, including false statements that the plaintiff had been arrested overseas); *Rowlett v. Fairfax,* 446 F.Supp. 186, 188–89 (W.D.Mo.1978) (action arising out of distribution of FBI arrest records); *Hammons v. Scott,* 423 F.Supp. 625, 627–28 (N.D.Cal.1976) (same).[64]

---

**64.** The application of *Paul v. Davis* to cases brought against federal officers for violations of constitutional rights under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), as well as cases filed against state officers under 42 U.S.C. § 1983, negates Professor Tribe's argument that "*Paul v. Davis* must be understood as a case about federalism–based limits on the remedial powers of a federal court acting under § 1983 rather than as a repudiation of deep substantive principles under the fourteenth amendment." L. Tribe, American Constitutional Law 971–72 (1978) (footnote omitted); *see also id.* at 972 n. 33 & 16 n. 3 (Supp.1979).

Professor Tribe's unnaturally narrow view of *Paul*—which denies that the case stands for any substantive principles of constitutional law—is also contradicted by the plain language of the opinion in *Paul.* While the Court in *Paul* was obviously concerned that the plaintiff's contentions "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States," *Paul v. Davis, supra,* 424 U.S. at 701, 96 S.Ct. at 1160, the holding of the Court was unambiguously based on its interpretation of the scope of the constitutional rights invoked by the plaintiff:

> None of respondent's theories of recovery were based upon rights secured to him by the Fourteenth Amendment.

424 U.S. at 713–14, 96 S.Ct. at 1166. There is nothing even "purportedly procedural," L. Tribe, American Constitutional Law, *supra,* at 972 n. 33, about this holding.

As an interpretation of both the due process clause and the constitutional right of privacy, *Paul v. Davis* has been forthrightly criticized by commentators who disagree with, and disapprove of, the restrictive view of these rights taken by the *Paul* Court. *See, e. g.,* Note, *Reputation, Stigma & Section 1983: The Lessons of Paul v. Davis,* 30 Stanford L.Rev. 191, 203–07 (1977); Note, *Paul v. Davis: The Taming of 1983,* 43 Brooklyn L.Rev. 147, 165–70

(1976); *The Supreme Court, 1975 Term* 90 Harv.L.Rev. 56, 92–95 (1976). *See also Paul v. Davis, supra,* 424 U.S. at 720–35, 96 S.Ct. at 1169–1177 (1976) (Brennan, J., dissenting). However, Professor Tribe's attempt to rewrite *Paul v. Davis* as a procedural limitation on actions under 42 U.S.C. § 1983, devoid of any substantive content, is simply untenable.

While Professor Tribe's interpretation of *Paul* is too narrow in that it would read out of the decision the due process and privacy principles articulated by the Court, it is simultaneously too broad in another respect. Professor Tribe's construction strongly implies that *Paul* imposes a requirement that plaintiffs in § 1983 actions pursue available state law tort remedies before bringing their constitutional claims in federal court. However, nothing in *Paul* indicates that the Court intended to overrule the holding of *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961), that 42 U.S.C. § 1983 contains no state–law exhaustion requirement. Any doubt on this score was recently settled by *Board of Regents v. Tomanio,* ––– U.S. –––, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). There, in three separate opinions, representing the views of all nine Justices, the Court reaffirmed the vitality of the "no exhaustion" holding of *Monroe.* For the Court, Justice Rehnquist (the author of *Paul*) wrote:

> This Court has not interpreted § 1983 to require a litigant to pursue state judicial remedies prior to commencing an action under this section. In *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), we held that "[i]t is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked."

*Board of Regents v. Tomanio, supra,* ––– U.S. at –––, 100 S.Ct. 1790 at 1798–99, 64 L.Ed.2d 440. *See also id.,* ––– U.S. at –––, 100 S.Ct. at 1799 (Stevens, J., concurring); *id.,* ––– U.S. at –––, 100 S.Ct. at 1801 (Brennan, J., dissenting).

■ *Paul v. Davis* clearly disposes of the plaintiffs' privacy claim.[65] More broadly, *Paul* establishes that the interest which the plaintiffs claim has been invaded by the defendants—their interest in preserving their good reputations—is not protected by the United States Constitution, although it may well be safeguarded by the tort law of one or more states. This leaves only the plaintiffs' allegations that the defendants violated their First Amendment freedoms of expression and association.

These First Amendment claims are derivative in nature. The plaintiffs allege no action by the defendants which directly abridged their rights to speak or to associate with like—minded persons. Rather, they only claim that among the ultimate consequences of the transmission of a telex which placed them in an unfavorable light were a decline in the membership and activity of the plaintiff organizations, a loss in the lecturing activity and income of the individual plaintiff and an increase in police harassment of them. Such indirect injuries, not otherwise of constitutional dimensions, may not be "bootstrapped" into a First Amendment claim. *Cf. Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 183–84, 71 S.Ct. 624, 654–55, 95 L.Ed. 817 (1951) (Jackson, J., concurring) ("mere designation" by the Attorney General as "subversive" deprived organizations of "no legal right or immunity," for damage to their ability to recruit members, attract audiences and raise funds was the result "of public disapproval," not the law).

In the First Amendment context, the Supreme Court has stated that

to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as a result of that action.

*Laird v. Tatum*, 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972), *quoting Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937). The allegations in the complaint and in the deposition of Gonzalez do not raise a genuine factual question that the defendants' acts caused any direct injury to their exercise of rights protected by the First Amendment. *See Reilly v. Leonard*, 459 F.Supp. 291, 300–01 (D.Conn.1978) (Clarie, C.J.) (rejecting as too indirect an allegation of injury a plaintiff's claim that false statements made by officials of the Connecticut State Police violated his First Amendment rights by causing him to fear prosecution, thereby chilling his exercise of the freedom of speech).

■ Moreover, even if the lack of a direct connection between the alleged harm to the plaintiffs' First Amendment rights and the acts of the defendants did not doom the plaintiffs' First Amendment claims, the conclusory nature of the relevant "factual" allegations would do so. In support of those vague allegations, which would have had difficulty surviving a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P.,[66] the plaintiffs have submitted only the equally imprecise assertions of Gonzalez' deposition testimony. The plaintiffs have thus failed to "bring to the district court's attention some affirmative indication that [their] version of relevant events is not fanciful," *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). Because they have developed no specific facts which would provide a basis for a viable First Amendment claim, the plaintiffs " 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Id., quoting SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). *See also Maldonado v. Flynn*, 485 F.Supp. 274, 286 (S.D.N.Y.1980) (Weinfeld, J.). Summary judgment for the defendants on the plain-

**65.** Unlike the plaintiff in *Paul v. Davis*, the plaintiffs here have not alleged that their due process rights were violated.

**66.** *See, e. g., Albany Welfare Rights Organization Day Center, Inc. v. Schreck*, 463 F.2d 620, 623 (2d Cir. 1972), *cert. denied*, 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973); *Reilly v. Leonard*, 459 F.Supp. 291, 301 (D.Conn.1978); *Bergman v. Stein*, 404 F.Supp. 287, 297–98 (S.D.N.Y.1975).

tiffs' First Amendment claims is therefore warranted.

While the court holds that the plaintiffs' constitutional claims are legally insufficient in their entirety, the court would have granted the pending motions of each of the defendants for summary judgment on those claims even if the plaintiffs had otherwise established the merit of their allegations that the dissemination of the June 18 telex caused injury to their constitutionally protected rights. In the case of defendant Money, his qualified immunity under the doctrine of *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) furnishes an independent reason to grant summary judgment; in the cases of defendants Chapman and Leonard, the question of immunity need not even be reached, for the undisputed facts establish that they were simply not responsible for the June 18 telex, and are therefore inappropriate defendants. These separate and additional grounds for summary judgment on the plaintiffs' constitutional claims are discussed briefly below.

*(b) Money's Qualified Immunity*

■ In *Butz v. Economou, supra,* the Supreme Court held that a federal executive officer sued for violating constitutional rights under the doctrine of *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) was entitled to the protection of the same qualified immunity which protects a state official sued under 42 U.S.C. § 1983.[67] *Butz v. Economou, supra,* 438 U.S. at 505–08, 98 S.Ct. at 2910–11.[68] The test for this immunity which was adopted in *Butz* is that set forth in *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), a case brought under 42 U.S.C. § 1983:

It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good–faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*See Butz v. Economou, supra,* 438 U.S. at 507, 98 S.Ct. at 2911 (adopting the limited immunity of *Scheuer* in *Bivens* actions); *see also Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975) (school administrator in § 1983 action would lose immunity only "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student"). *Accord, Procunier v. Navarette,* 434 U.S. 555, 561–62, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978) (prison officials entitled to the qualified immunity of *Scheuer* and *Wood*); *O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975) (same standard for qualified immunity of superintendent of state hospital).

■ The test for qualified immunity made applicable to constitutional claims against federal officers by *Butz v. Economou, supra,* includes a subjective element– the defendant's sincere, good–faith "belief that he is doing right," *Wood v. Strickland, supra,* 420 U.S. at 321, 95 S.Ct. at 1000. It also includes an objective element–the existence of "reasonable grounds for the belief formed at the time and in light of all the circumstances," *Scheuer v. Rhodes, supra,* 416 U.S. at 247–48, 94 S.Ct. at 1692. *See Gomez v. Toledo,* ── U.S. ──, ──, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980).

**67.** Section 1983 applies, by its terms, only to persons acting under color of state law. It does not provide for an action against federal officers, such as Money and Chapman, for violating individuals' constitutional rights. In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court recognized an analogous cause of action against federal officials. The court assumes,

without deciding, that this case was properly brought against the federal defendants under the theory of *Bivens.*

**68.** The Court in *Butz* held that a motion for summary judgment was an appropriate vehicle for determining the merits of a qualified immunity defense. *Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

**1074**

■ The undisputed facts here establish that Money believed that he was acting solely to save the lives of police officers. There is not even a hint in the record of any improper motive, nor a shred of evidence that Money was anything but sincere in his belief that he was acting lawfully to further a proper and important purpose.[69] The subjective element of the test for qualified immunity is therefore not in doubt.

The reasonableness of Money's belief that he was acting properly and lawfully in transmitting the information in the Intelligence Report to the Connecticut State Police in the manner he did is also clear. Money could reasonably fear, after reading the Intelligence Report, that police officers' lives might be in danger. It was reasonable for him to communicate the alarming report to the police, particularly because he only did so after checking with a superior and with the regional intelligence officer responsible for the Intelligence Report, and because, in passing the "kill a cop a day" story to state authorities he was making no representations as to the accuracy of the information, but was merely transmitting it for "whatever it [was] worth." [70] Money's repeated efforts to obtain verification and more detailed information about the story from the INS regional intelligence officer (who, Money had reason to believe, was checking with the sources of the story) [71] before the Connecticut State Police sent out the June 18 telex also strongly support his claim that he acted reasonably. While the story about the alleged plot to kill police officers apparently upset Money, at no time did he act so precipitously with regard to it that his actions may be deemed unreasonable; it cannot fairly be said that he lacked reasonable grounds for believing his conduct to be lawful and justified.

Against these uncontroverted facts, the plaintiffs only make the argument that, because the information in the Intelligence Report came to Money's attention through that regularly published report, rather than a special bulletin, it was unreasonable for Money to have acted quickly to get the information to the State Police.[72] However, the publication schedule of the Intelligence Report—i. e., the fact that it appeared on a regular basis—does not contradict the facts establishing that all of Money's actions were consistent with a reasonable good faith belief that he was performing his duties properly and consistently with the law. The case might be a different one if Money had hastily contacted the State Police without first talking to others in the INS, or transmitted the information contained in the Intelligence Report in a manner calculated to alarm the police and cause them to publicize it with undue haste, or failed to take steps to verify the report. But, as the uncontested facts here establish, Money's actions may not fairly be characterized as anything but reasonable.

In sum, the plaintiffs have made no showing that there are any issues of fact material to the question whether Money is entitled to the qualified immunity defense, and the court finds his defense to be valid. At most, the plaintiffs have created "the mere possibility that a factual dispute *may* exist" as to the merits of that defense; such a possibility, "without more, is not sufficient to overcome [the] convincing presentation by the moving party." *Quinn v. Syracuse Model Neighborhood Corp., supra,* 613 F.2d at 445 (emphasis in original). Money would therefore be entitled to summary judgment on the basis of his qualified immunity even if the court had not found that the plaintiffs' constitutional claims were devoid of merit.

(c) *Chapman as an Inappropriate Defendant on a Bivens Claim*

■ Since defendant Chapman is not alleged to have had any role in the prepara-

---

**69.** *See* text accompanying notes 6–39, *supra.*

**70.** *See* text accompanying note 17, *supra.*

**71.** *See* text accompanying notes 13–30, *supra.*

**72.** Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment, pp. 6–7. The plaintiffs' contention that Money was acting outside the scope of his duties, *see id.* at 6, must be rejected for the reasons stated in the text accompanying notes 60–61, *supra.*

tion or publication of the June 18 telex, his alleged liability must be based on the theory that as the Washington–based head of the INS he was somehow responsible for the acts of Money, a second–tier official in the INS Hartford office, many steps down the bureaucratic ladder. However, even if Money were liable in an action under the doctrine of *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, supra,* Chapman could not be held responsible for Money's conduct, since the principle of *respondeat superior* has no application in *Bivens* actions. *See Kite v. Kelley,* 546 F.2d 334, 337–38 (10th Cir. 1976); *Black v. United States,* 534 F.2d 524, 527–28 (2d Cir. 1976); *Fayerweather v. Bell,* 447 F.Supp. 913, 916 (M.D.Pa.1978); *Home Indemnity Co. v. Brennan,* 430 F.Supp. 828, 832–33 (S.D.N.Y.1977).[73] Chapman is therefore not an appropriate defendant on the plaintiffs' constitutional claims.

#### (d) Leonard as an Inappropriate Defendant Under 42 U.S.C. § 1983

■ Even if the transmission of the June 18 telex violated the plaintiffs' constitutional rights, defendant Leonard could not be held liable to the plaintiffs on those claims. As noted previously, he was not responsible for the preparation or dissemination of the telex in any way, and did not even see the telex message until after it had been sent out by Sergeant Taylor.[74] The absence of any link between Commissioner Leonard and the acts which allegedly violated the plaintiffs' rights entitles Leonard to summary judgment, for he cannot be held accountable under 42 U.S.C. § 1983 for anything which he neither did nor authorized. *See Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Duchesne v. Sugarman,* 566 F.2d 817, 830–31 (2d Cir. 1977); *Arroyo v. Schaefer,* 548 F.2d 47, 51 (2d Cir. 1977); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974); *Johnson v.*

*Glick,* 481 F.2d 1028, 1033–34 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Drug Purchase, Inc. v. Dubroff,* 485 F.Supp. 887, 892 (S.D.N.Y. 1980) (Lasker, J.); *Kane v. City of New York,* 468 F.Supp. 586, 590 & n.20 (S.D.N.Y. 1979) (Weinfeld, J.); *Holland v. Rubin,* 460 F.Supp. 1051, 1053 n.2 (E.D.N.Y.1978); *Schumate v. New York,* 373 F.Supp. 1166, 1170 (S.D.N.Y.1974); *cf. Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976).

#### (3) The Privacy Act

■ The complaint purports to state a cause of action under section 3(g)(1) of the Privacy Act, 5 U.S.C. § 552a(g)(1). That provision permits, *inter alia,* an individual aggrieved by an agency's non–compliance with certain record–keeping and other requirements of the Privacy Act to bring a civil action "against the agency." For purposes of the Privacy Act, the term "agency" is defined by reference to 5 U.S.C. § 552(e), a provision of the Freedom of Information Act. 5 U.S.C. § 552a(a)(1). That statute provides, in pertinent part, that "the term 'agency' . . . includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(e). The term does *not* include individual officers or employees of an agency, and an action may not be brought against them under 5 U.S.C. § 552a(g)(1). *Smiertka v. United States Department of Treasury, Internal Revenue Service,* 447 F.Supp. 221, 221 n.1 (D.D.C. 1978), *vacated on other grounds,* 604 F.2d 698 (D.C.Cir.1979); *Rowe v. State of Tennessee,* 431 F.Supp. 1257, 1264 (E.D.Tenn. 1977), *vacated on other grounds,* 609 F.2d 259 (6th Cir. 1979); *Morpurgo v. Board of Higher Education,* 423 F.Supp. 704, 714 n.26

---

**73.** The plaintiffs' contention that a *Bivens* action, unlike an action under 42 U.S.C. § 1983, may be predicated on the theory of *respondeat superior, see* Tr. 35–36, is refuted by the overwhelming weight of authority cited above.

**74.** *See* text accompanying notes 34 and 62, *supra.*

(S.D.N.Y.1976) (Weinfeld, J.). While the INS might be a proper party defendant in a Privacy Act case arising out of its handling of records pertaining to the plaintiffs, Money, Chapman and Leonard may not be sued under that statute.[75]

Moreover, the plaintiffs have all but abandoned their claims under the Privacy Act. At the oral argument on the pending motions, counsel for the plaintiffs was frank in his concession that this case does not involve an agency "record" or "systems of records," within the meaning of the Privacy Act, 5 U.S.C. §§ 552a(a)(4) and 552a(a)(5).[76] The Privacy Act claim would fail on that ground, even if the plaintiffs had sued the proper defendants under the statute. Because the plaintiffs may not maintain the claims against Money, Chapman and Leonard under the Privacy Act, and because the plaintiffs have in any event virtually conceded that those claims are not meritorious, the court grants summary judgment for the defendants on the plaintiffs' purported Privacy Act claims.

## II. THE PLAINTIFFS' MOTION TO JOIN ADDITIONAL PARTIES AS DEFENDANTS

Under Rule 20(a), Fed.R.Civ.P.,

[a]ll persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, of series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

The plaintiffs' motion to join as defendants Attorney General Civiletti, the INS and the State of Connecticut is apparently designed only to permit the plaintiffs to assert against these putative defendants the same claims which had previously been asserted against the existing defendants. The plaintiffs do not intend to raise new legal issues if joinder is permitted.[77] The identity between the claims already in the case and those which would be added and the many common questions of fact support permissive joinder under Rule 20(a).

However, joinder under that rule is not automatic. The rule only provides that persons "may be joined" if the conditions provided therein are satisfied; there is no requirement that they *must* be joined in that event. While the court generally views requests to join additional defendants with favor, *see* 3A *Moore's Federal Practice*

---

**75.** The court expresses no views on the merits of any claim which the plaintiffs may assert against the INS under 5 U.S.C. § 552a(g)(1). Indeed, even if the court were so inclined, it could not meaningfully do so, because the complaint merely lists provisions of the Privacy Act without alleging any facts in support of the proposition that the Privacy Act was somehow violated.

**76.** The relevant colloquy at oral argument was the following:

The Court: Now, on the Privacy Act claim to which you adverted earlier, and to which reference is made in the complaint, I didn't see any allegations of fact which made it clear the basis of the Privacy Act claim, and I wanted to give you an opportunity to give us some details here.

Mr. Kunstler: Judge, we're not sure, either. We have some feeling, I think I indicated at the beginning of my argument, we have some feeling that the Privacy Act might have been just a throwing in of a jurisdictional basis because a report was involved.

I have to be very candid with the Court, I am not quite certain that the Privacy Act applies. I would have some doubt in sustaining it argumentatively before you.

The Court: So you are not prepared to, for example, refer us to any particular provision of the Privacy Act which might have been violated or indicate precisely which defendants might have violated it?

Mr. Kunstler: No. Like Mr. Santoro, I know it's a very confusing Act, and I have read it over and over again, and I find it difficult to apply to this case, because we're not really dealing with an official agency report. What we are dealing with is an intelligence bulletin that floated around.

But I don't think, myself, it's within the agency records that's in the Privacy Act and the Freedom of Information Act. So I have difficulty sustaining it.

I don't want to hang my credibility on that Privacy Act claim.

Tr. 38–40. *See also* Tr. 31.

**77.** *See* Plaintiffs' Memorandum in Support of Motion to Add Parties Defendant, pp. 2–4.

¶ 20.06 (2d ed. 1979), it retains broad discretion in ruling on such a motion to act to prevent prejudice and undue delay. *See Barr Rubber Products Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1126–27 (2d Cir.), *cert. denied*, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970); *Fair Housing Development Fund Corp. v. Burke*, 55 F.R.D. 414, 420 (E.D.N.Y.1972); *Allied Chemical Corp. v. Strouse, Inc.*, 53 F.R.D. 588, 589–90 (E.D. Pa.1971).

In deciding this motion, the court notes that this case has been pending for four years. The proposed addition of parties must be viewed in light of the need to avoid unnecessary delay. The court exercises its discretion to deny the motion insofar as it seeks to join defendants on claims which would, on the basis of the legal conclusions reached today on the motions for summary judgment, surely fail. With regard to such claims, the interests of avoiding undue delay and needless expense to the parties already before the court dictate that joinder be denied, rather than granted for the purpose of subsequently entertaining motions to dismiss or for summary judgment on the basis of the conclusions of law reached by the court today. With a view to short–circuiting such pointless proceedings, the court assesses the motion to join additional parties in light of the law already applied to the summary judgment motions on each of the three categories of claims at issue here— (a) possible defamation claims; (b) the "constitutional tort" theories of the plaintiffs; and (c) the plaintiffs' Privacy Act claims.

*A. Defamation Claims*

■ Attorney General Civiletti, who was not in office in 1976 and is not alleged to have had anything to do with the events which gave rise to this action, is obviously an inappropriate party on the claim for defamation. Moreover, even if the plaintiffs would otherwise have a cause of action for defamation against him, he would be entitled to the absolute immunity which the court determined to be applicable to Money on the basis of *Barr v. Matteo, supra*.[78]

78. *See* text accompanying notes 59–61 *supra*.

■ There is no basis for permitting the joinder of the INS on a claim for defamation. As an integral part of the United States government, the INS is immune from damage actions for libel or slander under an exemption contained in the Federal Tort Claims Act. 28 U.S.C. § 2680(h). *See Quinones v. United States*, 492 F.2d 1269, 1279 (3d Cir. 1974); *Baca v. United States*, 467 F.2d 1061, 1064 (10th Cir. 1972); *Kessler v. General Services Administration*, 341 F.2d 275, 276 (2d Cir. 1964) (per curiam); *Hoesl v. United States*, 451 F.Supp. 1170 (N.D.Cal.1978); *Teplitsky v. Bureau of Compensation, United States Department of Labor*, 288 F.Supp. 310 (S.D.N.Y.), *modified on other grounds*, 398 F.2d 820 (2d Cir.), *cert. denied*, 393 U.S. 943, 89 S.Ct. 311, 21 L.Ed.2d 280 (1968); *DiSilvestro v. United States*, 181 F.Supp. 860, 862 (E.D.N.Y.), *cert. denied*, 364 U.S. 825, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960).

■ Finally, the plaintiffs may not sue the State of Connecticut for defamation in this court, for the state is entitled to the protections of the Eleventh Amendment to the United States Constitution:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

It is, indeed, difficult to imagine a claim more squarely within the scope of this prohibition than a tort claim against Connecticut, brought by the plaintiffs here. In the absence of any indication that Connecticut consents to be sued on such a claim, this court is without authority to entertain it. *See generally Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459, 462–65, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

Inasmuch as the plaintiffs have no viable claim for defamation against any of the proposed additional defendants, the court will not permit joinder for the purpose of

allowing the plaintiffs to make such claims against Civiletti, the INS and the State of Connecticut.

### B. Constitutional Claims

The conclusion that the plaintiffs' constitutional claims are legally insufficient, and therefore cannot survive the pending motions for summary judgment,[79] applies with equal force to the assertion of the same claims against the additional defendants whose joinder has been proposed by the plaintiffs. Permitting the plaintiffs to join additional defendants on these claims would inevitably lead to motions by the new defendants for summary judgment or to dismiss for failure to state a claim; on the basis of the law of the case as determined earlier in this decision, such motions would certainly be granted. Rather than encourage such an exercise in futility, the court denies the plaintiffs' motion to the extent that the plaintiffs seek to add defendants on their constitutional claims.[80]

### C. Privacy Act Claims

██ As the court observed in connection with the motions for summary judgment, the cause of action provided by 5 U.S.C. § 552a(g)(1) extends only to claims against "agencies" within the meaning of the Privacy Act. Of the additional defendants whose joinder is the subject of this motion, only the INS might be within the statutory definition. However, the court will not permit the plaintiffs to add the INS as a party on its Privacy Act claim, which is cast in vague and imprecise terms and, by concession of plaintiffs' counsel, does not even involve any agency "records" within the meaning of the Privacy Act.[81]

*Conclusion*

For the reasons stated herein, the court: (1) grants the federal defendants' motions for summary judgment in their entirety; (2) grants defendant Leonard's motion for summary judgment in its entirety; and (3) denies the plaintiffs' motion to join as additional defendants Attorney General Benjamin Civiletti, the Immigration and Naturalization Service and the State of Connecticut. Judgment shall be entered for the defendants, dismissing the complaint, in accordance with this Memorandum and Order.

It is so ordered.

---

**79.** *See* text accompanying notes 63–66, *supra.*

**80.** The plaintiffs claim that the recent Supreme Court decisions in *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) and *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) support their motion to join additional defendants. Assuming for the sake of argument that the plaintiffs are correct in asserting that *Owen* deprives Connecticut of a qualified immunity de-

fense to an action under 42 U.S.C. § 1983 and that *Carlson* expands the cause of action established in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), joinder is nonetheless inappropriate as a result of the court's holding that the plaintiffs' constitutional claims are substantively insufficient.

**81.** *See* note 76, *supra.*