Roger **KNELL**, Plaintiff-Appellant,

v.

Peter B. **BENSINGER et al.,** Defendants-Appellees.

No. 74–1803.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1975.

Decided Sept. 26, 1975.

Edward B. Beis, Chicago, Ill., for plaintiff-appellant.

William J. Scott, Atty. Gen., Jayne A. Carr, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and BRYAN, Senior District Judge.*

FAIRCHILD, Chief Judge.

This appeal presents the important and recurring question of the scope and content of the limited immunity of prison administrators from damages in suits challenging actions taken in the course of their official responsibilities.

Plaintiff Roger Knell was convicted of armed robbery and sentenced to serve three to eight years imprisonment in the Illinois State Penitentiary, Stateville Branch. During his term of incarceration, on November 17, 1971, following a hearing before the prison disciplinary committee, plaintiff was placed in disciplinary isolation for fifteen days for having written a letter to an unauthorized person and smuggling the letter out of the prison. While in isolation, plaintiff requested three habeas corpus petition forms, a typewriter, law books, and consultation with an inmate "jail house lawyer." These requests were denied pur-

---

* Senior District Judge Frederick van Pelt Bryan of the Southern District of New York is sitting by designation.

suant to a then applicable prison regulation which barred any access to reading material and all mail and visiting privileges to inmates in isolation custody.[1] On December 2, 1971, plaintiff was released from isolation and returned to the general prison population. After his confinement in isolation terminated, plaintiff appeared before the institutional merit staff committee which revoked three months of his accumulated statutory good time and demoted him to a status in which his future good time credits would be computed by a less favorable formula.

On January 18, 1972 plaintiff filed a complaint in the district court pursuant to 42 U.S.C. § 1983 against defendant Peter B. Bensinger, then Director of the Illinois Department of Corrections, alleging a denial of access to the courts while confined in isolation and a denial of procedural due process in hearings before the disciplinary committee and merit staff. Injunctive relief and damages were requested. On May 3, 1972, a second complaint was filed contesting the loss of statutory good time and reduction in status.[2] The district court granted a motion for summary judgment in the first action and dismissed the second for failure to state a claim for which relief could be granted.

Plaintiff filed notices of appeal in both cases which were consolidated. In an opinion set forth at 489 F.2d 1014 (7th Cir. 1973), this court vacated the judgments of the district court, indicating that the enforcement of the rule during plaintiff's confinement in isolation constituted a denial of access to the courts to challenge the legality of his confinement during its pendency. The cause was remanded for further proceedings in order to determine "whether appellant can prove damages arising out of his denial of access to the courts during his 15 days in isolation." *Id.* at 1018. In connection with the request for injunctive relief, the court rejected defendant's argument that the implementation of a superseding regulation on April 3, 1973 which provided that inmates in isolation receive normal visiting and legal mail privileges mooted the request. On remand, the district court was further instructed to "determine whether the regulations in force at Stateville do in fact permit effective challenge of punitive isolation by inmates other than those who have retained counsel or are sufficiently learned in the law to challenge their confinement effectively without advice and without the tools of legal research." *Id.* Following an evidentiary hearing, the district judge entered judgment in favor of defendants and against plaintiff, decreeing that plaintiff take nothing for money damages and that the cause be dismissed on the merits. This appeal by plaintiff followed.[3]

## I. Injunctive Relief

The district court found that "[t]he regulations currently in force at

---

1. The challenged policies were set forth in the pamphlet "Inmate Guidance" which plaintiff was given to read upon commitment to Stateville. Both parties agree that attorneys of record were permitted to confer with clients committed to institutional isolation, although this practice was not disclosed in the pamphlet.

2. Also named as defendant was John J. Twomey, at that time warden of the Illinois State Penitentiary, Joliet-Stateville Branch. At oral argument before this court, plaintiff's counsel conceded that his claim for damages lay solely against defendant Bensinger and that Twomey had acted in good faith in enforcing the regulation and was accordingly immune from damages.

3. This court also directed the district court to consider on remand whether the hearings plaintiff received prior to his confinement to punitive isolation and the revocation of good time credits and status grade comported with the standards set forth in *United States ex rel. Miller v. Twomey*, 479 F.2d 701 (7th Cir. 1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102. The district court's findings and conclusions failed to address this issue, but plaintiff does not raise this omission as error. Moreover, we note that subsequent to our first opinion, *cf. Thomas v. Pate*, 516 F.2d 889, 890 (7th Cir. 1975), this court held the standards set forth in *Miller* concerning procedural due process requirements in prison disciplinary procedures were to be applied prospectively only.

Stateville do in fact permit effective challenge of punitive isolation by inmates other than those who have retained counsel or are sufficiently learned in the law to challenge their confinement effectively without advice and without the tools of legal research." A careful examination of the record before the district court provides sparse evidentiary support for this finding. Little if any testimony was offered concerning the reach or meaning of the superseding regulation concerning disciplinary isolation.[4] It is unnecessary, however, to remand this issue for further consideration by the district court. It is apparent from the record that plaintiff was released on parole from the Illinois State Penitentiary, Stateville Branch, on January 18, 1973, and discharged from the custody of the Illinois Department of Corrections on February 19, 1974. Plaintiff's action seeking injunctive relief was not brought as a class action. Thus, the question presented concerning the constitutionality of the present regulations is moot and may not be further considered in the context of the present litigation. *DeFunis v. Odegaard*, 416 U.S. 312, 316–320, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

## II. Damages Relief

The district court denied all money damages to plaintiff, finding that "[t]he defendants followed the Illinois Department of Corrections policies concerning isolation during the periods of time alleged in good faith and with the honest belief that said policies conformed to announced legal principles and standards relevant to the subject matter of the department policy." In addition, the court concluded as a matter of law that defendant's good faith enforcement of

the isolation policies "was not unreasonable in the light of then-existing legal standards." Plaintiff takes issue with these conclusions, asserting that under the Supreme Court decisions of *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) and *Ex Parte Hull*, 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), the requirements of free and effective access to the courts by prison inmates were clearly enunciated and that defendant, as the state officer with primary responsibility for the operation of the Illinois penal system, must be held responsible in damages for their abridgment.

 At the outset of our consideration of this matter, we note that it is clear that, unlike judges or members of the legislature, state executive officials do not enjoy an absolute immunity from personal liability as to all acts performed within the scope of their official duties. Compare, *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) and *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) with *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Rather, "[i]n varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief coupled with good faith belief formed at the time and in light of all the circumstances, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer v. Rhodes*,

---

**4.** This court noted that "[t]he complete frustration of a prisoner's attempt to consult an advisor or use the prison law library [to aid in the challenge of the legality of his confinement in isolation during its pendency] may constitute an effective denial of access to the courts quite apart from the denial [of] the right to send mail to the court under the old regulation." 489 F.2d at 1017. There was evidence offered which, though ambiguous, could be viewed as establishing that, under the new regulation, prisoners could write out and receive legal materials while in isolation. There was no evidence whatsoever concerning whether "jail house lawyers" or other inmate legal assistance is available to prisoners while in isolation under the new regulation.

*supra*, 416 U.S. at 247–48, 94 S.Ct. at 1692. The policy consideration underlying the concept of immunity, absolute or qualified, for public officials is the necessity of insuring principled and conscientious governmental decision making by affording some measure of freedom from fear of personal liability for the official exercise of discretion and the performance of required duties.[5] The concept reflects recognition that government officials may err in their official actions, but that "it is better to risk some error and possible injury from such error than not to decide or act at all." *Id.* at 242, 94 S.Ct. at 1689. See also, *Hampton v. City of Chicago, Cook County, Ill., supra*, 484 F.2d at 607.

The Supreme Court's most recent consideration of the concept of the qualified immunity of state executive officers is set forth in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In that case, two high school students who had been expelled from school for violation of a school regulation brought suit under 42 U.S.C. § 1983 against local school officials seeking damages and injunctive and declaratory relief, claiming the expulsions infringed upon their constitutional rights to procedural due process. In articulating the appropriate standard to apply in determining whether the school administrators were liable for damages, the Court held:

> . . . the appropriate standard necessarily contains elements of both [an "objective" and a "subjective" test of good faith]. The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ig-

norance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. . . Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. 420 U.S. at 321–322, 95 S.Ct. at 1000.

■ While the Court's formulation in *Wood v. Strickland* was expressly limited to "the specific context of school discipline," we conclude that the two-pronged standard therein articulated applies equally to challenges to the official conduct of correctional administrators. First, we note that the Supreme Court itself, in subsequent cases concerning the assessment of damages against state mental health officials for alleged deprivations of liberty of mental patients, vacated the judgments and remanded to

---

**5.** One justification for the absolute immunity of judges and legislators is the desire "to give the officer freedom to exercise his discretion . . . without fear that his conduct will be called into question at an evidentiary hearing . . . ." *Hampton v. City of Chicago, Cook County, Illinois*, 484 F.2d 602, 607 (7th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471. As a consequence, in those situations in which absolute immunity is suc-

cessfully claimed, the action is defeated at the outset on a motion to dismiss. *Id.* This justification is lacking in the more limited and qualified immunity accorded to executive officials who "may or may not be subject to liability depending on all the circumstances that may be revealed by evidence [on summary judgment or at trial]." *Scheuer v. Rhodes, supra*, 416 U.S. at 239, 243, 94 S.Ct. at 1688.

the Court of Appeals for reconsideration in light of *Wood.* See, *O'Connor v. Donaldson,* 422 U.S. 563, 576–577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Gumanis v. Donaldson,* 422 U.S. 1052, 95 S.Ct. 2673, 45 L.Ed.2d 705 (1975). Such dispositions establish that the test is not intended to be limited to school discipline cases.[6] Moreover, the Court, in looking beyond subjective good motive, displayed concern over permitting ignorance of settled principles of law to justify a denial of a constitutional right by administrators "entrusted with supervision of student's daily lives." Clearly, such justifications are similarly inappropriate with regard to the action of correctional administrators. Their decisions profoundly affect all aspects of the lives and daily existence of the inmates entrusted to their care.

■ Applying these standards to the actions challenged at bar, we conclude that the judgment of the district court must be affirmed. The first issue to be confronted is whether, in enforcing the challenged regulation against plaintiff, defendant acted "sincerely and with a belief that he [was] doing right. . ." *Wood v. Strickland, supra,* 420 U.S. at 321, 95 S.Ct. at 1000. A careful review of the record fails to disclose any evidence whatsoever of subjective bad faith on the part of defendant in enforcing the regulation. The district court's findings of good faith application of the rule to all inmates with an honest belief in its constitutionality are fully supported by the record.

■ The final consideration, then, is whether defendant, in enforcing the regulation which was subsequently found impermissibly to interfere with plaintiff's effective access to the courts, acted "with such disregard of the [plaintiff's] clearly established constitutional rights

that his action cannot reasonably be characterized as being in good faith." *Id.* at 322, 95 S.Ct. at 1001. In requiring that the actions of state officials meet an objective good faith standard as well as the traditional bad motive test, the Supreme Court sought to insure that careless disregard or negligent ignorance of clear constitutional rights and duties would not be insulated from liability under the policy of encouraging the reasoned exercise of official discretion by government officers in the course of their duties. Accordingly, in the context of prison administration, while the importance of administrative experimentation and discretion in the development of correctional policies and disciplinary procedures has been noted, *cf. Wolff v. McDonnell,* 418 U.S. 539, 566–569, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), in exercising their informed discretion, officials must be sensitive and alert to the protections afforded prisoners by the developing judicial scrutiny of prison conditions and practices.

■ We start, as we must, with an examination of the law as it existed at the time of the complained of actions. State officials are not "charged with predicting the future course of constitutional law." *Pierson v. Ray, supra,* 386 U.S. at 557, 87 S.Ct. at 1219. See also, *Adams v. Carlson,* 488 F.2d 619, 629 (7th Cir. 1973). As plaintiff argues, the right of prisoners to reasonable and effective access to the court was well established by 1971. As early as 1941 in *Ex Parte Hull,* 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), the Supreme Court held invalid a Michigan prison regulation requiring that all legal documents produced by prison inmates be submitted to the institutional welfare office and the legal investigator of the Parole Board for preliminary screening and discretionary filing with the designated court as

---

**6.** See also, *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir. 1975) in which the standards of *Wood v. Strickland, supra,* and *Scheuer v. Rhodes, supra,* were utilized to formulate the conditions under which the affirmative defense of reasonableness and good faith was established in cases of alleged invasion of constitutional rights by police officers.

an unconstitutional interference with the inmate's access to the court. "[T]he state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." *Id.* at 549, 61 S.Ct. at 642. Similarly, in *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), a Tennessee prison regulation which provided that "[n]o inmate will advise, assist or otherwise contract to aid another, either with or without a fee, to prepare Writs or other legal matters" was found to have "in substance, deprived those unable themselves, with reasonable adequacy, to prepare their petitions, of access to the constitutionally and statutorily protected availability of the writ of habeas corpus." *Id.* at 489, 89 S.Ct. at 751. Finally, in *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), the Court affirmed the judgment of a three-judge district court, *Gilmore v. Lynch*, 319 F.Supp. 105 (N.D.Cal.1970), which required state officials to provide indigent inmates with access to a reasonably adequate law library for preparation of legal actions.

■ Thus, it is clear that, at the time of the challenged occurrence, there existed a well established principle that the state could not absolutely deny inmates incarcerated in its prisons a reasonable and effective right of access to the courts to challenge their confinement by means of a petition for habeas corpus.[7] This principle encompassed not only the right directly to petition the court without unreasonable interference, *Ex Parte Hull, supra*; but also the means necessary effectively to present any claims including the right to the assistance of a "jail house lawyer," *John-*

son v. Avery, supra, and the right of access to necessary legal materials. *Gilmore v. Lynch, supra.*

Plaintiff has not, however, alleged or established a policy of absolute deprivation of effective access to the courts.[8] Rather, he has shown its denial only during limited disciplinary confinement in isolation. The record establishes that, under the challenged policy, prisoners were placed in disciplinary isolation only after the finding by a disciplinary committee of a violation of prison regulations. Confinement in isolation was limited to a maximum of 15 days. We are thus presented with the narrow question of whether it was unreasonable, in light of then-existing precedent, for defendant to deny inmates all mailing privileges, access to legal materials, and assistance of "jail house lawyers" while serving time in disciplinary isolation, imposed for the violation of prison regulations and limited in duration to 15 days or less.

■ We conclude that it was not. During this period, the courts displayed a general unwillingness to interfere with prison disciplinary actions and procedures absent arbitrary and invidious discrimination or caprice. " 'Inmates of State penitentiaries should realize that prison officials are vested with the wide discretion in safeguarding prisoners committed to their custody. Discipline reasonably maintained in State prisons is not under the supervisory direction of federal courts. . . . A prisoner may not approve of prison rules and regulations, but under all ordinary circumstances that is no basis for coming into a federal court seeking relief even though he may claim that the restrictions placed

---

7. The right of effective access to the courts was extended to civil rights actions brought challenging conditions of confinement in *Wolff v. McDonnell, supra,* 418 U.S. at 577–80, 94 S.Ct. 2963. This view had been advanced prior to 1971. *Cf. Nolan v. Scafati,* 430 F.2d 548, 551 (1st Cir. 1970). Moreover, while plaintiff could undoubtedly have challenged his isolation confinement by seeking a temporary restraining order in a civil rights suit, *Johnson v. Avery* itself discloses that a writ of habeas

corpus challenging the increased confinement of isolation would have been equally appropriate. See, generally, *Preiser v. Rodriguez,* 411 U.S. 475, 499, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

8. We note, for instance, that defendant filed the instant action within a month and a half of the termination of his isolation confinement with the assistance of a "jail house lawyer."

upon his activities are in violation of his constitutional rights.'" *United States ex rel. Morris v. Radio Station WENR,* 209 F.2d 105, 107 (7th Cir. 1953) cited with approval in *Walker v. Pate,* 356 F.2d 502, 504 (7th Cir. 1966), *cert. denied,* 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678. See also, *Sawyer v. Sigler,* 445 F.2d 818, 819 (8th Cir. 1971); *United States ex rel. Knight v. Ragen,* 337 F.2d 425, 426 (7th Cir. 1964), *cert. denied,* 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277. Moreover, in the interests of institutional safety, discipline and security, the courts recognized and deferred to curtailment and restriction of rights and privileges upon disciplinary confinement. See, *Hatfield v. Bailleaux,* 290 F.2d 632 (9th Cir. 1961), *cert. denied,* 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59. *Cf. Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948).

In *Hatfield v. Bailleaux, supra,* the court was presented with a California prison regulation which, in pertinent part, prohibited prisoners, while confined in punitive isolation, from communicating with attorneys, judges or courts except in cases already pending, and then only in the discretion of prison authorities; and also denied access to legal materials, papers and documents. Reversing an order enjoining this provision, the court noted that "[t]he periods of confinement in isolation are of relatively short duration [from 5 to 27 days among the named plaintiffs]. Confinement in isolation . . . is imposed only for violations of the prison rules and regulations. There is no attempt in imposing such confinement to discriminate against persons engaged in legal work. Nor is such confinement arbitrarily imposed in any other respect. There is no finding that any appellee has ever been confined in isolation under conditions, which, as to safety or health, warranted immediate court relief therefrom." 290 F.2d at 638. Careful research has not disclosed any other judicial consideration of this prac-

tice and the factors deemed relevant by the court in finding a lack of denial of effective access to the courts were concededly present in the instant case as well.

Upon consideration of the development of the law at the time of the challenged occurrence, we concur with the district court's conclusion of law that the defendant's belief in the propriety of the practice was reasonable at that time and did not represent such disregard of the plaintiff's established constitutional rights as to be reasonably characterized as being in bad faith. While effective access to the courts was clearly established as a principle of due process by 1971, and defendant's policy necessarily abridged that right during plaintiff's 15-day commitment to isolation, the issue of whether a temporary denial could be effectuated for a fixed and limited duration in response to violations of prison regulations in the interests of institutional safety and security was not foreclosed. We find especially important the decision of the Ninth Circuit in *Hatfield* which squarely confronted the question, and under circumstances not dissimilar to those presented here, accepted the practice as constitutionally valid.[9] In light of the cases discussed above, defendant might well have reasonably believed that, so long as the period of denial was limited and the punishment was imposed neutrally for violation of internal prison regulations, the denial of access to the courts was *de minimis* and justified by the exigencies and considerations of prison discipline. While this court subsequently disagreed with the conclusion of *Hatfield* concerning such a practice, it was not unreasonable for defendant to rely upon it at the date in question here and he must therefore be found to be immune from damages.

The judgment of the district court is accordingly affirmed.

Affirmed.

---

9. We note that *Hatfield, supra,* was cited favorably, though for a different aspect of its holding, in *Johnson v. Avery, supra,* 393 U.S. at 490, 89 S.Ct. 747, and the ruling concerning isolation denial of access to the courts was not questioned or commented upon.