Joseph Paul LANGTON and Mona
Jean Langton

v.

Francis H. MALONEY, Commissioner,
et al.

Civ. No. H–76–86.

United States District Court,
D. Connecticut.

Oct. 20, 1981.

Joseph Paul Langton, pro se.

Margaret Hayman, Conn. Civil Liberties Union, Hartford, Conn., for amicus curiae.

Carol A. Feinstein, Asst. Atty. Gen., Marilyn P. A. Seichter, Hartford, Conn., for defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT

BLUMENFELD, Senior District Judge.

Plaintiffs filed this suit for damages and injunctive relief claiming that actions taken by the Connecticut Department of Children and Youth Services relating to the custody of their daughter violated their constitutional rights. The plaintiffs are Joseph and Mona Langton, the divorced parents of Julie Langton, who at the time of the acts referred to in the complaint was a 13-year-old child. The defendants are the former Commissioner of the Connecticut Department of Children and Youth Services (DCYS), the Deputy Commissioner, and two social workers employed by DCYS. The *pro se* complaint alleges that the defendants deprived plaintiffs of the custody of their daughter without due process in violation of their rights under the fourteenth amendment.

Defendants have moved, under Rule 56(b) Fed.R.Civ.P., for summary judgment, claiming that:

1. the action is a suit against the state which is barred by the eleventh amendment;

2. the defendants acted in good faith in the course of their official duties and hence are immune from suit;

3. the complaint fails to state a claim for which relief may be granted.

Both sides have briefed this motion. Because the plaintiffs have maintained this

suit *pro se*, the court requested an *amicus* brief from the Connecticut Civil Liberties Union. The CCLU filed a brief on behalf of the plaintiffs on the issue of whether the complaint states a cause of action. Also in view of the *pro se* nature of the complaint, the court has exercised its powers of judicial notice to inquire into the judicial record pertaining to Julie's custody and the plaintiffs' parental rights at the time of the events complained of.

## FACTS

Joseph and Mona Langton were married in Massachusetts in 1959. They had three children during their marriage. Joseph and Mona were divorced in Springfield, Massachusetts in 1967, and custody of the children was awarded to Mona, who continued to live in Massachusetts.[1] Joseph remarried in 1969 and came to live in Connecticut. In February 1975, Joseph and Mona agreed that their 13-year-old daughter, Julie, would come to live with Joseph and his wife in Connecticut. Apparently neither Mona nor Joseph sought permission for this arrangement from the Massachusetts court which had granted them their divorce and awarded custody.[2] On February 26, 1975, after Julie was already residing with her father in Connecticut, the Massachusetts Department of Public Welfare, Office of Social Services, sought and obtained an *ex parte* order modifying the Langton's divorce decree to grant the department temporary custody of Julie. The department moved for rehearing, with notice to all parties. A hearing was scheduled for March 6, but there is no indication that the hearing ever took place.[3]

The Massachusetts department contacted the Connecticut Department of Children and Youth Services (DCYS) to inform it that Julie was living with her father in Connecticut. Massachusetts informed DCYS that it had acquired legal custody of Julie, and it asked DCYS to "monitor" Julie's home situation, apparently because of past reports of sexual abuse of Julie by her father. Pursuant to the Massachusetts request, defendant Marvin Harris of the Protective Services division of DCYS assigned DCYS social worker Charlotte May to investigate in March 1975. In April 1975, Ms. May completed her investigation and concluded that Julie was "not in any immediate danger in her father's home." This information was given to Massachusetts authorities by letter dated April 17, 1975, and the investigation was closed.

On October 11, 1975, Julie ran away from her father's home in South Windsor, Connecticut. On October 12 she appeared at the foster home of Mr. and Mrs. Thomas Keogh of Manchester. Julie there made charges that her father had repeatedly sexually molested her. The Keoghs contacted the Manchester police and the DCYS. That evening defendant Jane Magura, a DCYS social worker, interviewed Julie concerning her allegations, beginning about 11:30 p.m.[4] Ms. Magura then took Julie to the South Windsor police, where at 2:30 a.m. she signed a statement of her charges against her father.

In the meantime, Joseph had reported to the South Windsor police on the evening of the 11th that Julie was missing. On the 12th he learned that she was at Crossroads and that DCYS had become involved. He was informed that Julie would not be returned to him despite his insistence that she be returned.

On the basis of Julie's statement to the police, a warrant for Joseph's arrest was

---

1. Joseph was given visitation rights and was required to provide support. The divorce decree stated that it was subject to later modification.

2. The record indicates that by this time the divorce decree had been modified several times. Joseph's right to visit Julie was in February 1975 limited to two hours every six weeks.

3. No further legal action was taken by Massachusetts authorities until after Julie had been returned to Massachusetts in October 1975.

4. At some time on the 11th or 12th, Julie went to stay at an institution in Manchester known as Crossroads. She apparently remained there until she was taken to Massachusetts on the 14th.

procured, and he was arrested and charged.[5] DCYS then obtained an *ex parte* order from Connecticut Superior Court on October 13, granting immediate temporary custody to DCYS Commissioner Maloney for a period of seven days. Section 17–38e of the Connecticut General Statutes authorizes such an order when one of the child's parents has been arrested on a charge involving abuse, neglect, or impairment of the health or morals of a child.

On October 14, Joseph and Mona filed a petition in the Connecticut Superior Court for a writ of habeas corpus to have Julie brought to the court for a hearing. DCYS officials were named as respondents. There is no indication in the record that service was ever made.

Also on October 14,[6] Marvin Harris, in consultation with other DCYS officials, determined that Julie should be taken to Massachusetts and turned over to officials there. This decision was apparently reached after contacting the Massachusetts Department of Public Welfare and determining that it still claimed legal custody. The defendants did not seek or obtain the authorization of any court for the transfer. In the late afternoon of October 14, Ms. Magura and Ms. May, acting under the direction of Mr. Harris, drove Julie to Springfield and turned her over to Mr. Jack Gates of the Massachusetts Department of Public Welfare.

At the October 16 hearing on the habeas petition, Mr. Harris informed the court that Julie had been taken to Massachusetts and turned over to authorities there on the basis of the February 26, 1975 Massachusetts temporary custody order. The petition was accordingly dismissed for lack of jurisdiction.

■ On February 13, 1976, plaintiffs filed this action seeking both monetary and injunctive relief.[7] Plaintiffs claim that defendants' actions in obtaining temporary custody of Julie and then returning her to Massachusetts violated their liberty interest in retaining custody of their child without due process of law.

## THE MOTION

Defendants have moved for summary judgment on the grounds recited above. The eleventh amendment issue, since it implicates the jurisdiction of this court, must be considered first. Because the court concludes that the eleventh amendment does not bar this action, it will consider the related question of official immunity to suit under section 1983. Finally the court will determine whether the complaint states a claim for which relief may be granted.

### 1. The Eleventh Amendment

■ The eleventh amendment provides: The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State.

The amendment has consistently been held to encompass a prohibition of suits against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 663–64, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). The defendants claim that this suit against them, various state officials, is, in effect, a suit against the state and thus barred by the eleventh amendment. *See Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945) (eleventh amendment applies even though state not a named party where state is real party in interest).

■ The Supreme Court has long held that the eleventh amendment does not bar all suits against state officials. Just as any sovereign may waive immunity, a state may waive its eleventh amendment immunity. Furthermore, Congress, acting under sec-

---

5. The charges were later dropped after Julie was taken to Massachusetts.

6. Mr. Harris denies having received notice of the habeas petition as of this date.

7. Since Julie has reached the age of majority and is therefore no longer subject to anyone's custody, it would appear that plaintiffs' claims for injunctive or declaratory relief are moot.

tion 5 of the fourteenth amendment, may override the eleventh amendment immunity so as to secure the rights of all citizens to equal protection of the laws. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 451–56, 96 S.Ct. 2666, 2669–71, 49 L.Ed.2d 614 (1976) (Title VII, as legislation under section 5 of fourteenth amendment, abrogates eleventh amendment immunity to sex-discrimination suit against state for back pay). In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court held that the eleventh amendment was not a bar to an action in federal court against a state attorney general seeking to enjoin him from enforcing a state statute alleged to infringe federal constitutional rights. In attempting to enforce an unconstitutional statute, the state official would come into conflict with the supremacy of federal law,

> and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Id.* at 159–60, 28 S.Ct. at 453–54. *Ex Parte Young* has come to mean that the eleventh amendment does not bar prospective injunctive relief against a state in federal court. *See Fitzpatrick v. Bitzer,* 445 U.S. at 451, 96 S.Ct. at 2669. In *Edelman v. Jordan,* 415 U.S. 651, 662–71, 94 S.Ct. 1347, 1355–59, 39 L.Ed.2d 662 (1974), however, the Court held that the eleventh amendment was a bar to the award of damages against state officials for past violations of federal statutory law where it was clear that the award would be paid out of the state treasury.

From this set of cases, one might conclude that the eleventh amendment barred actions for damages, but not suits for injunctions against state officials. *Edelman v. Jordan* cautioned, however, that the eleventh amendment would bar an action despite its allegedly equitable nature if funds, other than those to be expended for future compliance, will inevitably come from the state treasury. *Id.* at 663–71, 94 S.Ct. at 1355–59.[8] Conversely, in *Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90, the Court reversed a dismissal and held, on the basis of *Ex Parte Young,* that state officials did not enjoy personal eleventh amendment immunity to damage suits for deprivations of federal rights under color of state law. Thus, although *Edelman v. Jordan* had held that section 1983 did not abrogate a state's eleventh amendment immunity (despite being legislation under section 5 of the fourteenth amendment), 415 U.S. at 675–77, 94 S.Ct. at 1361–62, state officials may be liable in damages under section 1983 when they are sued in their personal capacities.[9]

■ Thus, a suit for damages against state officials is not barred by the eleventh amendment if the officials are sued in their personal capacities and if the complaint alleges that the officials acted wantonly, maliciously, arbitrarily or outside the scope of their official powers. *Scheuer v. Rhodes,* 416 U.S. at 237–38, 94 S.Ct. at 1686–87.

The defendants claim that insofar as the complaint seeks damages against them, it is barred by the eleventh amendment. Having considered the allegations of the complaint, and having outlined the recent

---

8. *But see Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), in which the Court held that the eleventh amendment did not bar an award of attorney's fees under 42 U.S.C. § 1988 against a state agency.

That *Edelman* would permit prospective expenditures of state money was underscored by *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) where the Court affirmed a district court order requiring a state to contribute approximately six million dollars to defray the costs of court-ordered desegregation. *See Hutto v. Finney,* 437 U.S. at 690 n.15, 98 S.Ct. at 2537 n.15.

9. In *Scheuer v. Rhodes* the Court reversed the dismissal of the complaint where the defendants were sued in both their personal and official capacities. 416 U.S. 232, 236–38, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974). Thus, although the case may appear to allow damage suits against state officials in their official capacities, the opinion lays heavy emphasis on the fact that the allegations of the complaint "seek[ ] to impose individual and personal liability on the *named defendants* . . . ." *Id.* at 238, 94 S.Ct. at 1687 (emphasis in original).

twists and turns of eleventh amendment law, the court will now consider this claim.

The complaint does not contain any allegations of personal misconduct on the part of any of the defendants except for Mr. Harris, and barely, Ms. May. Indeed, the complaint does not allege any conduct at all on the part of Mr. Maloney or Ms. Dille. The only element of the complaint that could be construed to meet the test of *Scheuer v. Rhodes* to avoid the eleventh amendment bar is paragraph 18, which reads in relevant part as follows:

> The Defendants did conspire, by their words and deeds, to act arbitrarily and wanton by transporting said minor child, Julie Langton, across state lines without authority . . . .

This paragraph, however, is unsupported by any allegation as to the involvement of any defendant other than Harris and May in these events, or by any claim that defendants' acts were outside the scope of their official authority.

 a. *Francis Maloney.* Although Commissioner Maloney, like all the defendants, is sued in both his personal and official capacities, it is clear that he is named in this lawsuit only because of his status as Commissioner of DCYS, that is, as an official of the state. The complaint makes no allegations of personal misconduct, or indeed of any conduct at all, on the part of Mr. Maloney, but only names him as the person generally responsible for administration of DCYS. Since Mr. Maloney is not alleged to have had any personal involvement with the case,[10] and since any damage award against him would clearly come from the coffers of the state, the eleventh amendment bars suit against him insofar as the suit seeks monetary damages. Dismissal is therefore granted in favor of defendant Maloney as to any claim for monetary relief.

 b. *Jeanette Dille.* The complaint alleges only that Ms. Dille, Deputy Commissioner of DCYS, was responsible for the administration and supervision of children placed with the department. Ms. Dille will suffer no personal liability as a result of the exercise of her official duties within the scope of her responsibilities, *see Scheuer v. Rhodes*, 416 U.S. at 237–38, 94 S.Ct. at 1686–87, and thus the complaint is confronted squarely by the eleventh amendment bar.[11] It is clear that the action against this defendant is in essence an action against the state, and that any recovery would inevitably come from the state treasury. As such, it is barred by the eleventh amendment, and this defendant must be dismissed from the action to the extent that it seeks monetary damages. *Edelman v. Jordan*, 415 U.S. at 663, 94 S.Ct. at 1355–56; *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).

 c. *Charlotte May.* The complaint alleges that Ms. May, who is also sued in both her individual and official capacities, was during the time period in question a social worker with the DCYS with responsibility for the care and supervision of children placed with that department. As is the case with Mr. Maloney and Ms. Dille, however, the complaint fails to make any specific allegations of Ms. May's involve-

---

**10.** The facts disclosed by the depositions of the defendants do not show any basis on which personal misconduct *could* be alleged. Mr. Maloney's deposition confirms that he had virtually no involvement with the particulars of the Julie Langton case, other than to discuss the file with Jeanette Dille just prior to the time that Ms. Dille went to court in response to the Langtons' habeas petition. Mr. Maloney's only involvement was to have a discussion with a subordinate, in which the subordinate informed him of the general facts of the case and assured him that it was being handled according to law.

**11.** Again, the facts disclosed by the depositions and answers to interrogatories fail to show a basis on which a sufficient complaint could be made against Ms. Dille. Ms. Dille's deposition discloses that she did have some involvement with the Julie Langton case. It does not appear, however, that Ms. Dille was involved in any way with the decision to remove Julie Langton to Massachusetts, which is the gravamen of the plaintiffs' complaint. Indeed, to the extent that Ms. Dille had any involvement at all, it appears to have been purely administrative.

ment in the Julie Langton case except for her involvement in the physical transportation of Julie to Massachusetts. Since it is alleged that this act was arbitrary and wanton and in violation of plaintiffs' rights, however, the eleventh amendment bar is avoided under the *Scheuer v. Rhodes* test.

■ d. *Marvin Harris*. The complaint alleges that Mr. Harris was a supervisor with the Protective Services Division of DCYS during the time in question, with responsibility for the care and supervision of children placed with the department. It alleges that Mr. Harris misled the Manchester police department to believe the DCYS had obtained custody of Julie and thus induced the police not to help Mr. Langton recover his daughter on the night of October 12.[12] It further alleges that Mr. Harris concealed Julie's whereabouts from plaintiffs on October 13, and it suggests that he participated in the decision to remove her to Massachusetts on the following day. The complaint alleges that Harris' actions were arbitrary and wanton.

■ The substance of these allegations is that Mr. Harris, as a principal actor, acted to deprive plaintiffs of their right to a hearing prior to having custody taken away from them. There are sufficient allegations (although inartfully pleaded) to support the claim that the complaint seeks to impose personal responsibility, *see Scheuer v. Rhodes*, 416 U.S. at 238, 94 S.Ct. at 1687, on Mr. Harris for his willful allegedly illegal acts, *id.* at 235, 94 S.Ct. at 1685–86. The eleventh amendment does not bar the action against Harris.

### 2. *Good Faith Immunity*

Since this action is brought under 42 U.S.C. § 1983, defendant state officials claim that they have a qualified immunity to suit under that statute on the principles of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct.

992, 43 L.Ed.2d 214 (1975) and that the plaintiffs have not offered sufficient support for any allegations of bad faith to withstand a motion for summary judgment. The Supreme Court has long held that section 1983 is subject to those immunities which were traditionally available at common law. *Owen v. City of Independence*, 445 U.S. 622, 635, 100 S.Ct. 1398, 1407, 63 L.Ed.2d 673 (1980) (municipality has no immunity from liability under section 1983). The court has therefore afforded absolute immunity to those directly involved in the judicial process, *see Imbler v. Pachtman*, 424 U.S. 409, 417–29, 96 S.Ct. 984, 988–94, 47 L.Ed.2d 128 (1976) (prosecutors); *Pierson v. Ray*, 386 U.S. 547, 554–55, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967) and *Bradley v. Fisher*, 80 U.S. (13 Wall) 335, 344–57, 20 L.Ed. 646 (1872) (judges); *Tenney v. Brandhove*, 341 U.S. 367, 372–79, 71 S.Ct. 783, 786–89, 95 L.Ed. 1019 (1951) (legislators). In addition, the Court has held that a qualified immunity (no liability if acts are done in good faith) is available to a variety of officials. *See generally Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (qualified immunity available to school officials). The Court has endorsed qualified immunities of various degrees in a number of subsequent cases. *See Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (prison officials and officers); *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (superintendent of state hospital); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (governor and other executive officers); *Pierson v. Ray*, 386 U.S. at 555–57, 87 S.Ct. at 1218–19 (police officers). The Courts of Appeals have also extended this protection to various types of officials. *See Morrison v. Jones*, 607 F.2d 1269, 1273–74 (9th Cir. 1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980) (members of Board of Supervisors, director of

---

**12.** At his deposition, Mr. Harris was asked what he had told the police. He responded that he had informed them that Julie had run away and that she claimed her father had molested her. Harris said that he told the police that DCYS did not have custody, but that it could take custody if Julie made a statement to the police and her father were arrested. For purposes of the motion to dismiss based on the eleventh amendment, only the allegations of the complaint are relevant.

Department of Social Services, and director of child psychiatry at county hospital); *Wolfel v. Sanborn*, 555 F.2d 583, 591 (6th Cir. 1977) (parole officers); *Bryan v. Jones*, 530 F.2d 1210, 1213–15 (5th Cir.) (en banc), *cert. denied*, 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976) (jailers); *Guzman v. Western State Bank of Devils Lake*, 540 F.2d 948, 951–52 (8th Cir. 1976) (state bank officials); and *Knell v. Bensinger*, 522 F.2d 720, 725 (7th Cir. 1975) (correctional administrators).

■ Defendants here move for summary judgment, arguing that they are entitled to a qualified immunity, and that plaintiffs have not produced any support for what may be taken as their allegations of bad faith. With respect to the two defendants the court has dismissed on eleventh amendment grounds, this would certainly be true. Both Francis Maloney, as Commissioner of the Department of Children and Youth Services, and Jeanette Dille, as Deputy Commissioner, would be entitled to the qualified immunity accorded executive officers under *Scheuer v. Rhodes*, 416 U.S. at 238–49, 94 S.Ct. at 1687–93, were suit against them not barred by the eleventh amendment. Plaintiffs have adduced absolutely no evidence of a degree of involvement on the part of these defendants which would even call into question the good faith of their actions with respect to the Langton case. There is therefore an alternative ground for granting summary judgment in favor of these defendants. The court will proceed to give individual consideration to the two remaining defendants.

The initial question for the court is whether a state social worker is qualifiedly immune from liability under section 1983. If state social workers are covered by such an immunity, it would remain for this court to determine whether plaintiffs had brought forth sufficient evidence of Ms. May's bad faith to withstand a motion for summary judgment.

Some doubt was cast on the eligibility of state social workers to assert the defense of qualified immunity in an opinion by the Court of Appeals for the First Circuit,

*Downs v. Sawtelle*, 574 F.2d 1, 13–14 (1st Cir.), *cert. denied sub nom. Hagan v. Downs*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978). There two members of the panel held that there had been inadequate development of either the facts or the common law background to make a determination of either the availability or the application of a qualified immunity defense. *Id.* In a dissent, however, Chief Judge Coffin argued convincingly that reasonable inferences from the case law surrounding the question of qualified immunity would support the conclusion that a social worker would fall within the range of those permitted to assert the immunity. *Id.* at 16. Given the fact that the immunity has been explicitly extended by the Supreme Court to hospital administrators, school officials, police officers, prison officials, and executive officers, and by Courts of Appeal to parole officers, correctional staff, "and even state bank officials," *id.*, social workers would seem to be entitled to the same protection. Chief Judge Coffin noted that since the profession of social worker was a relatively new one, there would be little or no common law as to its immunities and that the public policy analysis, regarding the necessity for social workers to exercise discretion, would not differ significantly from the analysis with respect to the professions that had been granted the qualified immunity. *Id.* On remand the district court again determined that a qualified immunity was available to the social worker. *Downs v. Sawtelle*, Civ. No. 75–20–ND (D.Me.1979).

■ In *Duchesne v. Sugarman*, 566 F.2d 817, 829–30 (2d Cir. 1977), the Court of Appeals for the Second Circuit found that defendant supervisory level municipal child welfare employees would be entitled to assert the *Wood v. Strickland* qualified immunity defense on remand. The factual setting developed in this case shows the importance of the role of social workers in our society especially in the context of child welfare. The discretionary decisions of the social worker in the field should not be impeded by liability in damages for deci-

sions which might later be challenged. Rather a plaintiff should be subject to the standard announced in *Wood v. Strickland*, 420 U.S. at 321–22, 95 S.Ct. at 1000–01.

The immunity standard requires that an individual defendant have acted in both "objective" and "subjective" good faith. The objective element of the test would deny immunity to the defendants if "the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm." *Procunier v. Navarette, supra,* 434 U.S. at 562, 98 S.Ct. at 860.

*Sala v. County of Suffolk,* 604 F.2d 207, 209 (2d Cir. 1979), *vacated on other grounds,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). The subjective element of the test would deny immunity if the official

took the action with the malicious intention [of causing] a deprivation of constitutional rights or other injury to the [plaintiff].

*Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. at 1001. In applying this standard, it should be remembered that the extent of the immunity varies with the "scope of discretion and responsibilities of the office," *Scheuer v. Rhodes,* 416 U.S. at 247, 94 S.Ct. at 1692, so that higher ranking officials will be held to a greater knowledge of the state of the law. *Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. at 1001.

■ a. *Charlotte May.* It is clear that Ms. May, a social worker with the Department of Children and Youth Services, is entitled not only to assert the defense of qualified immunity but also to summary judgment on the basis of that immunity. Ms. May's only involvement in the case was to conduct the investigation and write a report in the spring of 1975, which is not in itself complained of, and then to accompany Ms. Magura, Julie Langton's caseworker, when Magura transported Julie to Massachusetts on October 14, 1975. Although as noted above, the complaint alleges that all the defendants acted arbi-

trarily and wantonly, plaintiffs have failed to develop any support for this allegation by way of interrogatories, depositions, or affidavits against Ms. May. Although Ms. May participated in removing Julie to Massachusetts, she did so on the direction of her superiors, and not on her own initiative. She knew at the time of that event that her report in the spring had not found any evidence that Julie was in danger. She also knew, however, that Massachusetts had claimed custody since that time and that DCYS was in temporary custody of Julie pursuant to a court order. She knew that DCYS's custody resulted from the arrest of Joseph Langton on a charge of sexually molesting Julie. She had no reason to doubt the validity of either the Connecticut or the Massachusetts court orders, and, not having been involved in the case since the spring, had no reason to doubt the authenticity of the charge against Mr. Langton made in October. Furthermore, even if it is correct that plaintiffs were entitled to a hearing before Julie was removed from Connecticut, there is no basis on which to charge a low-level employee of the DCYS with knowledge of even the possible invalidity of the Massachusetts custody order or any presumptively valid Connecticut statute under which Ms. May, at the direction of her superiors, was acting. In short, there is no evidence with respect to Ms. May that would negate her contention that her acts were in "objective" and "subjective" good faith. *See Gonzalez v. Leonard,* 497 F.Supp. 1058, 1075 (D.Conn.1980). Nothing in the record supports a finding that this defendant "acted with such an impermissible motivation or with such disregard of the [plaintiffs'] clearly established constitutional rights that [her] action cannot reasonably be characterized as being in good faith." *Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. at 1001. Summary judgment will therefore be granted as to Ms. May.

■ b. *Marvin Harris.* The analysis applied above demonstrates that Mr. Harris is also entitled to the benefit of a qualified immunity defense to the section 1983 suit

against him. As a social worker at the supervisory level, there is even more reason to grant him such an immunity. *See Duchesne v. Sugarman*, 566 F.2d at 829–30. The remaining question is whether Mr. Harris is entitled to summary judgment on the basis of his qualified immunity. The court finds that he is since there are no material facts in dispute.

To reiterate, in order to avoid liability, a defendant to whom qualified immunity is available must show that he acted in good faith, both objectively and subjectively. It must appear both that the defendant did not act contrary to clearly established constitutional rights of which he either knew or should have known, and that he did not act with the malicious intention of causing a deprivation of plaintiffs' constitutional rights or other injury. *Wood v. Strickland*, 420 U.S. at 322, 95 S.Ct. at 1001.

As was developed above, Mr. Harris was a principal actor in the Julie Langton case. Viewed in the light most favorable to plaintiffs, there is evidence of the following. He was the supervisor of the caseworkers involved. He had knowledge of all the relevant facts, having directed and received the report finding "no danger" in the spring and being aware, before October, of Massachusetts' claim of custody. After Julie left her father's home on October 11, Mr. Harris is alleged to have encouraged Julie to repeat her charges of sexual molestation to the South Windsor police, resulting in her father's arrest. Following that, DCYS obtained temporary custody through a Connecticut court order. Mr. Harris, in conjunction with a nondefendant, consulted with officials of the Massachusetts Department of Social Services. Since that agency confirmed that it had custody under the pending Massachusetts court order, it was decided to have Julie removed to Massachusetts. The removal was accomplished during the pendency of DCYS's temporary custody. It occurred after a filing of a petition for writ of habeas corpus by the plaintiffs,[13] and without seeking judicial approval.

Mr. Harris acted in reliance on a presumptively valid Connecticut statute in gaining temporary custody of Julie, and in reliance on a court order from Massachusetts in turning her over to authorities there. There is no indication that he should have known that the plaintiffs were entitled to a hearing prior to taking this action.

Nor is there any indication in the record of subjective bad faith on the part of Mr. Harris. Mr. Harris never met Julie Langton. His only contact with Joseph Langton was on the telephone the night of October 12. He appears to have acted out of a sincere desire to protect Julie's rights from being abused. Having dealt with the emergency situation at hand by obtaining the temporary custody order in Connecticut Superior Court, Mr. Harris worked with others in his department to determine if Julie ought to be returned to officials in Massachusetts. Upon learning that Massachusetts still claimed legal custody pursuant to the February Massachusetts court order, Harris and other DCYS officials took Julie to Massachusetts and turned her over to authorities there. As Harris knew, Massachusetts had obtained the custody order at about the time Julie came to Connecticut, and they had been unsuccessful in seeking to have Joseph return Julie to Massachusetts. Furthermore, Harris' uncontroverted testimony is that Julie was taken to Massachusetts before he was served with notice of the Langtons' petition for writ of habeas corpus; thus, although he did not seek court approval for the transfer, there is no indication that Harris sought to avoid the scrutiny of the court.

Although questions of good faith should not ordinarily be disposed of by way of motion for summary judgment, in this case it is only the allegations of the complaint, which are dispelled by depositions and answers to interrogatories on file and not supported by any evidence offered by the plaintiffs, that would cast any doubt on either the subjective or objective good faith of Mr. Harris. *Cf. Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153–61, 90 S.Ct. 1598,

---

13. Mr. Harris denies having been served with the plaintiffs' petition before Julie was taken to Massachusetts. No evidence has been offered to dispute his denial.

1606–10, 26 L.Ed.2d 142 (1970) (moving party's affidavits fail to dispel a critical allegation of the complaint). Under these circumstances, it is appropriate to grant summary judgment. Plaintiffs have produced absolutely no evidence in any form that would cast doubt on the statements Mr. Harris made in his deposition that indicate he acted in good faith. *See Gonzalez v. Leonard*, 497 F.Supp. at 1074.

### 3. A Claim Upon Which Relief May be Granted

As an alternative basis for its judgment, the court finds that plaintiffs have failed to state a claim upon which relief may be granted because in the circumstances of this case they are not entitled to assert the parental rights that they claim were harmed by the defendants.

First, it may be noted that plaintiffs' claims for injunctive relief have been mooted by the passage of time.[14] Liberally construed, however, the complaint seeks a declaration that the Connecticut statute on which defendants relied in taking temporary custody, Conn.Gen.Stat.Ann. § 17–38e (West 1975), is unconstitutional, and that defendants unconstitutionally deprived plaintiffs of their right to notice and hearing when they removed Julie to Massachusetts. This claim is not moot since it is necessary to a determination of plaintiffs' claim for damages.[15]

Substantively, plaintiffs' claim is that they enjoyed a liberty interest in the integrity of their family and that this liberty interest was impinged by defendants' failure to give them notice and an opportunity for a hearing before taking custody of Julie and before removing her to Massachusetts. Plaintiffs' claims for relief break into two parts. First, they claim that defendants acted unconstitutionally in obtaining temporary custody of Julie without affording them notice or hearing. Second, they claim a right to notice and hearing before Julie could be removed to another jurisdiction.

To make either claim, plaintiffs must show that they had a substantial liberty interest that was impaired by the actions of the defendants. Amicus curiae Connecticut Civil Liberties Union, which has briefed the substantive issues on behalf of the *pro se* plaintiffs, has convincingly set forth the substantial liberty interest in the integrity of the family. Defendants have not argued to the contrary, relying instead on procedural arguments. This court is satisfied that the interest purportedly at stake is a real and substantial one. *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 650, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977); see also, *H. L. v. Matheson*, 450 U.S. 398, 10 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (importance of family justifies state requirement that minors notify parents before obtaining abortion); *see generally*, "The Constitution and the Family," 93 Harv.L.Rev. 1156 (1980). The liberty interest in the integrity of the family encompasses an interest in *retaining* custody of one's children. *Duchesne v. Sugarman*, 566 F.2d at 824–25. Thus the state may not interfere with a parent's custodial rights absent due process protections. *Id.*

Whether the plaintiffs in this case have a right to assert this interest, however, is another matter. The acts complained of took place in Connecticut, and the defendants are Connecticut state officials. Yet the plaintiffs and their daughter were subject to the power of the Massachusetts courts by virtue of their Massachusetts divorce. The divorce decree gave custody to Mona, the mother, and gave visitation rights to Joseph. The decree states on its face that it is subject to modification at a later date in accord with the Massachusetts divorce statute.

> Upon decree of divorce . . . the court may make such decree as it considers expedient relative to the care, custody and maintenance of the minor children of the parties . . . and afterward may from time to time . . . revise and alter such decree,

---

14. Julie, who was 13 at the time of the events in question, would by now have attained majority, and would thus no longer be subject to custodial actions on the part of the state.

15. Plaintiffs may be entitled to no more than nominal damages even if they were to prevail. *See Carey v. Piphus*, 435 U.S. 247, 262–66, 98 S.Ct. 1042, 1051–53, 55 L.Ed.2d 252 (1978).

as the circumstances of the parents and the benefit of the children may require. Mass.Gen.Laws Ann. c. 208, § 28. *See, e.g., Buchanan v. Buchanan,* 353 Mass. 351, 353, 231 N.E.2d 570 (1967); *Donnelly v. Donnelly,* 4 Mass.App. 162, 344 N.E.2d 195 (1976).

According to the complaint, Mona and Joseph agreed in the winter of 1975 that Julie should come to live with Joseph and his second wife in Connecticut. There is no indication, however, that either of them sought permission for this arrangement from any Massachusetts court or that they obtained a modification of the divorce decree to permit such an arrangement. Although this fact is not mentioned in the complaint, there is every indication that the Massachusetts authorities disapproved of the arrangement. Apparently shortly after Julie went to Connecticut to be with her father, the Massachusetts Department of Public Welfare went to the probate court in Springfield that supervised the Langtons' divorce and obtained a temporary order vesting custody in the Department. [This order was obtained ex parte, but the Department a few days later sought a rehearing with notice to the parties. Nothing in the record indicates whether notice was sent to Mona, but notice was mailed to Joseph on March 4. The hearing, 'which was scheduled for March 6, apparently never took place. In any case, there is no indication that either Joseph or Mona ever sought or attended a hearing in Massachusetts to challenge the temporary custody order.]

▆▆ Under these circumstances, it is hard to see how any parental interest of either Mona or Joseph was harmed by the actions of the Connecticut authorities in the fall of 1975. Mona's position remained unchanged by the events that transpired in Connecticut. She still had the same legal rights to her child, as modified by the temporary order placing custody in the Massachusetts Department of Public Welfare. She thus had neither physical nor legal custody either before or after the events complained of. Given the outstanding temporary custody order in Massachusetts, Mona could not have legally regained custody of Julie unless Julie were first turned over to the Massachusetts Department. Mona was therefore in no way harmed by the actions of the Connecticut DCYS in seeking temporary custody and then returning Julie to Massachusetts authorities. Thus, Mona's liberty interest in family integrity was not impaired and she is not entitled to seek damages for any due process deprivation.

Joseph's claim is no stronger. Joseph had never, since the 1967 divorce, had full legal custody of Julie. His rights with respect to Julie were limited to visitation. [Later orders of the probate court had substantially limited even his visitation rights with respect to Julie, although not as to the other children.] Although Joseph took physical custody of Julie in February 1975, his right to do so was certainly not recognized by the Massachusetts court that had granted his divorce and the temporary custody order. His removal unilaterally of Julie to Connecticut did not give him any right to control her custody. It is clear, then, that Joseph did not have legal custody. Furthermore, by the time of the events complained of, Joseph did not even have physical custody of his daughter. Julie had run away from her father's home. Since he did not have legal custody, he had no right to have her returned to him. Even if the Massachusetts temporary custody order was defective, the only other legal custody order had been issued by the Massachusetts probate court giving custody to Mona. Whatever parental rights Joseph still had with respect to Julie were not disturbed by the actions of the Connecticut officials who returned her to Massachusetts. He was still able to exercise whatever visitation rights he still had, and he was still able to challenge the Massachusetts temporary custody order in the Massachusetts courts, which is the only place he could ever have challenged it.

In short, it does not appear that any legal interest of these plaintiffs was harmed by the actions taken by the defendants. They therefore lack standing to complain of a deprivation of due process.

## SUMMARY

The action against defendants Francis Maloney and Jeanette Dille is barred by the

eleventh amendment. The defendants Charlotte May and Marvin Harris are entitled to summary judgment on the basis of good faith immunity. Even if the action were not barred by these immunities, the court has determined that the plaintiffs lack standing to assert a liberty interest in family integrity and thus may not seek damages for a deprivation of due process. Summary judgment is granted in favor of the defendants.

SO ORDERED.